In the Supreme Court of Georgia

Decided: June 1, 2021

S21P0078. YOUNG v. THE STATE.

MELTON, Chief Justice.

A jury found Rodney Renia Young guilty of the murder of Gary Jones and related crimes. The jury declined in its guilt/innocence phase verdict to find him "mentally retarded."[1] At the conclusion of the sentencing phase, the jury found multiple statutory aggravating circumstances and sentenced Young to death for the murder. For the reasons set forth below, we affirm Young's convictions and

[1] The mental condition now referred to as "intellectual disability" in the mental health profession and in Georgia law was previously, including at the time of Young's trial, referred to as "mental retardation." See *Hall v. Florida*, 572 U. S. 701, 704 (I) (134 SCt 1986, 188 LE2d 1007) (2014) (noting the change in terminology); OCGA § 17-7-131 (as amended in 2017 by Ga. L. 2017, p. 471, § 3). We use both terms in this opinion, using "intellectual disability" in our discussions of the condition in general terms and using "mental retardation" in our discussions, particularly in quotations, of the specific proceedings below and the law that applied to them.

sentences.[2]

1. Young had a seven-year relationship with Gary Jones's mother, Doris Jones, that was rife with arguments about money and Young's infidelity and included multiple breakups. After Young came to visit Doris in Georgia in November 2007 and the pair became engaged, Doris moved in with Young at his basement apartment in Bridgeton, New Jersey, in January 2008. The couple

---

[2] The victim was killed on March 30, 2008. A Newton County grand jury indicted Young on June 6, 2008, on one count of malice murder, two counts of felony murder, one count of aggravated assault, and one count of burglary. On August 7, 2008, the State filed written notice of its intent to seek the death penalty. The trial began with jury selection on February 6, 2012. The jury found Young guilty on all charges on February 17, 2012. On February 21, 2012, the jury recommended a death sentence for the murder, and that same day the trial court filed an order imposing a death sentence on the malice murder count. On February 22, 2012, the trial court filed an order merging the felony murders with the malice murder (although they were actually vacated by operation of law, see *Willis v. State*, 304 Ga. 686, 686 n.1 (820 SE2d 640) (2018)), merging the aggravated assault with the malice murder, and deferring sentencing on the burglary. On March 9, 2012, the trial court filed an order imposing a 20-year sentence for the burglary, to be served concurrently with the death sentence. On March 5, 2012, Young filed a motion for new trial, and he amended the motion on April 1, 2014, and September 5, 2017. Following multiple hearings, the motion was denied on April 9, 2019. Young filed a notice of appeal on June 6, 2019. An appeal was initially docketed in this Court on December 11, 2019, as Case No. S20P0630; however, on December 19, 2019, this Court struck the case from the docket and remanded it, directing the trial court to ensure that the record was complete. Following this remand, the case was redocketed to the term of this Court beginning in December 2020, and the case was orally argued on March 23, 2021.

argued in New Jersey, and Doris moved back to Georgia to once again live with her son, Gary, in Covington. Young wrote Doris multiple letters between January and March 2008, asking her to return to him. On March 3, Young obtained approval from his employer for time off on March 26 to 28. He subsequently contacted his half-sister, whom he had never personally met and who lived in Atlanta, and he told her that he was coming to see her while on vacation. Prior to his trip, Young borrowed a GPS device from his co-worker and obtained instructions on how to use it.

On March 28, Doris received yet another letter from Young, which she did not read immediately. When Doris awoke the next day, laundry that she had washed the night before had been folded, despite the fact that Gary had been staying with his girlfriend and no one else was home. That same weekend, Doris noticed that the laundry room window had a hole in it and that the screen on that window was missing. Testimony, cell phone records, and the memory of the GPS device that Young borrowed all showed that, from March 28 to 30, Young drove repeatedly from his half-sister's

3

home in Atlanta to the area of Gary's home in Covington. A witness testified that he gave a man with a New Jersey license plate directions from Covington Square to Gary's neighborhood; this witness later identified Young from a photographic line-up as that man.

On March 30, Gary attended church with his girlfriend and then returned home with a plan to meet his girlfriend later for dinner. A little after 1:00 p.m. that day, Gary told his grandmother on the telephone that he was arriving at his home and would call her back in 15 minutes, which he never did. Doris discovered Gary's body in the home at approximately 11:20 p.m. that night and called 911. Gary was lying on his side on the floor in the dining room, and he was tied to an overturned chair with duct tape, a telephone cord, and fabric from some curtains. A bloody butcher knife and a bloody hammer were found next to his body. The victim's body had multiple fractures to the skull, the left eye protruded from its socket, there were sharp force injuries to the neck, head, and face, and there were compression marks on the hands and legs indicating that the victim

4

was alive while bound. Glass in a door leading into the dining room from an outside patio had been shattered, and the home showed signs of a struggle, with blood in the foyer, living room, and dining room. The home had multiple writings on the walls, including the following as recounted by an investigator: "ATL mob $25,000, dead in 20 days, 20 days to get out of state or dead, the hit be on you, were know what you drive, ATL m-o-b, I want my f***ing money, $25,000, you work at GRNCS." The writings were matched at trial to Young's handwriting, and investigators testified that they were unaware of a gang called the "ATL mob."

Upon learning that Young had called her brother-in-law, Doris called Young on the day after the murder. Young told Doris that he would come to get her things and move her back to New Jersey and that he had seen Gary in a dream asking him to take care of her. Investigators interviewed Young in New Jersey on April 3, 2008; he had two cuts on his right hand, and he denied traveling recently to Georgia. A search of Young's car yielded printed directions from New Jersey to Covington and Doris's ring that had been discovered

missing from Gary's home, and a search of Young's basement apartment in New Jersey yielded Gary's cell phone and duct tape that was matched to the duct tape used to bind Gary.

Young presented evidence in the guilt/innocence phase in support of a possible finding of "mental retardation" by the jury, including testimony from staff members at his former high school stating that he had been in special education, had been classified as "educable mentally retarded" and therefore must have been tested with an IQ of between 60 and 69, and had struggled intellectually in academics and in sports. However, Young did not present any expert testimony regarding his alleged intellectual disability or any actual IQ test results. The State countered Young's evidence with cross-examination and direct testimony showing Young's ability to function normally at work and in various other settings in life. The State also presented testimony from an expert who, although he had not evaluated Young and had not formed an opinion as to whether Young was intellectually disabled, was able to testify about the subject of intellectual disability in general terms.

After reviewing the record, we conclude that the evidence presented in the guilt/innocence phase was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt that Young was guilty of all of the charges of which he was convicted and to find, considering the conflicting testimony on the subject, that Young had failed to prove beyond a reasonable doubt that he was "mentally retarded." See *Jackson v. Virginia*, 443 U. S. 307, 319 (III) (B) (99 SCt 2781, 61 LE2d 560) (1979) (providing the constitutional standard for the review of the sufficiency of the evidence of a crime); *King v. State*, 273 Ga. 258, 259 (1) (539 SE2d 783) (2000) (reviewing the sufficiency of the evidence regarding alleged intellectual disability); UAP IV (B) (2) (providing that, in all death penalty cases, this Court will determine whether the verdicts are supported by the evidence).

*Pretrial Issues*

2. We reject Young's argument, including his arguments specific to the practices of the prosecutor in his case, that Georgia's death penalty laws are unconstitutional in that they allegedly

7

permit unfettered discretion to prosecutors in choosing whether or not to seek the death penalty and thereby result in arbitrary and capricious results. See *Arrington v. State*, 286 Ga. 335, 336-337 (4) (687 SE2d 438) (2009); *Walker v. State*, 281 Ga. 157, 161 (6) (635 SE2d 740) (2006).

3. The trial court properly refused Young's attempt to plead guilty but mentally retarded to his murder charge in exchange for a life sentence, because the State objected to such a plea. See *Stripling v. State*, 289 Ga. 370, 376 (3) (711 SE2d 665) (2011).

4. We reject Young's arguments that he is entitled to a new trial based on several alleged discovery violations by the State.

(a) The record shows that the State disclosed the identity of Wanda Wilcher as a potential sentencing phase witness but listed her address as "private" because she had a restraining order against Young. The prosecutor represented to the trial court that she would have informed defense counsel of the witness's address if counsel had inquired. Under the circumstances, we conclude that the trial court did not abuse its discretion in not finding any prejudice to

8

Young or bad faith on the part of the prosecutor and, accordingly, in allowing the witness to testify after first allowing defense counsel an opportunity to interview the witness. See *Wilkins v. State*, 291 Ga. 483, 486-487 (5) (731 SE2d 346) (2012) (applying OCGA § 17-16-6).

(b) The record reveals that Young was aware well before trial of recordings of certain conversations between him and Doris Jones and, more importantly, that the State served him with the actual recordings by the statutory deadline.

(c) The trial court properly held that the State had no duty to disclose the criminal histories of witnesses, because Young had access to those records himself. See *Jackson v. State*, 306 Ga. 69, 89 (6) (d) (829 SE2d 142) (2019).

(d) After initially noting from the bench that the issue, at least at that time, was moot in light of the State's representation that it was aware of no such records, the trial court then also filed a written order denying Young's request for any psychiatric records of the State's witnesses based on its finding that "[n]o particularized

9

showing of necessity for or even existence of these records ha[d] been made." We see no error. See *King*, 273 Ga. at 262-263 (11) (holding that the defendant was not entitled to the psychiatric histories of the State's witnesses where he failed to show that the hypothetical records were critical to his defense, that substantially similar evidence was otherwise unavailable, and that the records were not privileged); *McMichen v. State*, 265 Ga. 598, 611 (24) (458 SE2d 833) (1995) ("In requesting the psychiatric histories of the state's witnesses, McMichen failed even to allege that such histories existed.").

(e)  The trial court properly declined to conduct an in camera review of the personnel records of the law enforcement officers who would testify at trial, because Young made no "specific showing of need." *Cromartie v. State*, 270 Ga. 780, 785-786 (12) (514 SE2d 205) (1999).

5.  Young argues that the State's use of funds from a victim assistance account, see OCGA § 15-21-130 et seq., to reimburse four witnesses for their lost wages without disclosing this fact to him at

10

trial constituted unconstitutional evidence suppression because evidence of the use of the funds would have served as impeachment evidence. To succeed on an evidence suppression claim, a defendant must establish four elements: (1) the State possessed evidence favorable to the defendant; (2) the defendant did not possess the evidence and could not obtain it with reasonable diligence; (3) the State suppressed the evidence; and (4) the suppression created a reasonable probability of a different outcome of the trial. See *McCray v. State*, 301 Ga. 241, 246 (2) (c) (799 SE2d 206) (2017). The trial court found that the first three elements had been satisfied, but it correctly determined that Young's claim failed on the fourth element.

As to the two witnesses at issue who testified regarding Young's guilt, their testimony showing his presence in Georgia at the time of the murder was cumulative of multiple other independent pieces of evidence showing that same fact. As to the two witnesses at issue who testified regarding Young's alleged intellectual disability, the witnesses were his co-workers who stated

11

merely that he had not been a problem employee, was a "good operator," and was punctual. Finally, as to the one witness at issue who testified in the sentencing phase, the witness stated that Young had physically abused her while they were dating, and she showed the jury a scar on her face from that abuse; however, a certified copy of a restraining order regarding this witness was independently admitted into evidence, and similar testimony showing Young's abusive nature was presented through Doris Jones. We also note that evidence regarding the State's reimbursement of these witnesses' actual lost wages would not have been strong impeachment evidence. Pretermitting whether the other three elements of this evidence suppression claim have been satisfied, we hold that the trial court's conclusion regarding the fourth element, materiality, was not erroneous and that the overall claim was therefore properly denied. See *United States v. Payne*, 63 F3d 1200, 1210-1211 (II) (A) (2) (2d Cir. 1995) (noting that the suppression of impeachment evidence does not warrant a new trial where the testimony of the witness who might have been impeached was

12

corroborated by other evidence and holding that the evidence presented at trial was "sufficiently strong" to support the appellate court's concluding that the suppression in the case "d[id] not undermine [the appellate court's] confidence in the outcome of the trial" and that the suppressed evidence therefore was "not material"). Cf. *Schofield v. Palmer*, 279 Ga. 848, 851 (1), 853 (3) (621 SE2d 726) (2005) (reaching a different conclusion where, unlike in Young's case where the witnesses enjoyed no actual gain but merely received reimbursement of their lost wages, "the GBI paid [a confidential informant] $500 for providing information implicating [the defendant]").

*Issues Related to the Jury*

6. Young challenged the composition of both his grand jury source list and his traverse jury source list. The trial court denied both challenges, and we see no error.

(a) (i) In his challenge to his grand jury source list, Young first claimed that an underrepresentation of African-American persons on the list violated both his statutory and constitutional rights. As

in a previous case in which this Court denied relief, the undisputed

evidence in Young's case

> showed that the jury commission in [Newton] County, pursuant to this Court's directive in the Unified Appeal Procedure, attempted to balance the percentages of various cognizable groups of persons on the [relevant] jury source list to match the percentages of those groups of persons reported in the most-recently available Decennial Census.

*Williams v. State*, 287 Ga. 735, 735 (699 SE2d 25) (2010), superseded

by the Jury Composition Reform Act of 2011 as noted in *Ellington v.*

*State*, 292 Ga. 109, 118 (4) n.2 (735 SE2d 736) (2012), disapproved

on other grounds by *Willis v. State*, 304 Ga. 686, 706 (11) (a) n.3 (820

SE2d 640) (2018).  See also *Ricks v. State*, 301 Ga. 171, 173 (1) (800

SE2d 307) (2017) (noting changes since *Williams* in the Code, in the

Unified Appeal Procedure, and in relevant rules).  In *Williams*, the

then-established process for constructing the jury list had combined

with shifting demographics in Clayton County to result in a

disparity of 17.49 percentage points between the percentage of

African-American persons on the jury source list and the percentage

of African-American persons as shown in the 2000 Census.  See

14

*Williams*, 287 Ga. at 737-738 (2). In Young's case, the disparity was 11.67 percentage points, or 11.37 percentage points if only the numbers of citizens involved were considered. See *Smith v. State*, 275 Ga. 715, 721 (4) (571 SE2d 740) (2002) (stating regarding cases where citizenship appears to be a significant factor: "When alleging underrepresentation of a distinctive group, a defendant 'must, to establish a prima facie case, present data showing that the percentage of persons in that group [on the jury list] is significantly lower than the percentage *eligible* to serve on juries.'" (quoting *United States v. Artero*, 121 F3d 1256, 1262 (III) (B) (9th Cir. 1997) (emphasis supplied)). The trial court did not err in following this Court's binding case law on this issue, particularly our prior holdings that the jury composition system then in place served "a 'sufficiently significant state interest' to rebut an otherwise-valid prima facie [claim]," and thus denying this portion of Young's challenge to his grand jury. *Williams*, 287 Ga. at 738 (2) (quoting *Ramirez v. State*, 276 Ga. 158, 162 (1) (c) (575 SE2d 462) (2003)).

15

(ii) Young's challenge to his grand jury source list also included an allegation of an underrepresentation of Hispanic persons. Young's expert testified that the Newton County jury commission had not separately accounted for Hispanic persons on the relevant jury certificate; however, the expert estimated the number of Hispanic persons included on the source list by performing a search for common Hispanic surnames. The expert testified that, as compared to census estimates of the population at the time of Young's indictment, Hispanic citizens were underrepresented on the grand jury source list by an absolute disparity of 0.91 percentage points.[3] See *Smith*, 275 Ga. at 721 (4). We note further that the uncontested testimony of the expert also showed that, as compared to the 2000 Census, the absolute disparity was 0.42 percentage points. Based on our holdings in *Williams* and *Ramirez*, which are discussed above, the figure based on the 2000 Census was the correct one to consider; however, considering either figure, the trial court

[3] Young's argument on appeal focuses on numbers of persons rather than on percentages; however, the numbers alleged by Young in his brief align with the percentages testified to by Young's expert.

16

did not err in concluding that no impermissible underrepresentation had been shown. See id. at 723 (4); *Morrow v. State*, 272 Ga. 691, 695 (1) (532 SE2d 78) (2000). Furthermore, even if an underrepresentation *had* been shown, there would be no reversible error, because Young did not even attempt to show in the trial court that Hispanic persons were a cognizable group in Newton County, a necessary part to his claim. See *Smith*, 275 Ga. at 718 (2) (holding that whether a group is a cognizable group in a given county is a matter of fact to be found by the trial court).

(b) Regarding the traverse jury source list, the trial court found, after discounting an obvious error on the jury certificate and crediting the testimony of Young's expert, that there was an absolute disparity of 2.88 percentage points between the percentage of Hispanic persons on the 2011 jury list as compared to the percentage of Hispanic persons in the actual population in 2010. The uncontested testimony of Young's expert also showed that the absolute disparity was 1.38 percentage points when only Hispanic *citizens* were considered. Considering either figure, the trial court

did not err in concluding that no impermissible underrepresentation had been shown. See *Smith*, 275 Ga. at 723 (4); *Morrow*, 272 Ga. at 695 (1).

7. The trial court did not err by refusing to compensate jurors beyond the amount authorized by OCGA § 15-12-7 (a) (2). See *Stinski v. State*, 286 Ga. 839, 846 (21) (691 SE2d 854) (2010).

8. After Young moved the trial court to order the State to disclose information about jurors concerning their possible connections to the State or possible driving and arrest records, the trial court accepted the representation from the State that it would reveal any false answers by jurors known to it on such subjects during voir dire. We see no error. See *Stinski*, 286 Ga. at 846 (23).

9. Young argues that his right to be present was violated during several bench conferences held during jury selection.[4] Although these bench conferences were not transcribed, despite the trial court's having granted Young's motion that all bench

---

[4] In his brief in this Court, Young provides identical citations to the record for two different jurors among the several he discusses. We have reviewed the record as to both of these jurors.

conferences should be, the trial court entered an order reconstructing the record of what transpired, see OCGA § 5-6-41 (f) (providing for supplementation of the record), and Young presented testimony at his motion for new trial hearing on the matter. As found by the trial court in its order denying the motion for new trial, Young sat during jury selection at the defense table with his three attorneys, he observed the voir dire, he remained at the defense table with one of his attorneys during the bench conferences, and yet he never objected to his absence from those bench conferences. The attorney who remained with Young refused to disclose the nature of their discussions, but Young testified that he and that lawyer did engage in conversations.

Jury selection is a critical stage at which a defendant generally is entitled to be present, including at bench conferences. See *Murphy v. State*, 299 Ga. 238, 240 (2) (787 SE2d 721) (2016); *Sammons v. State*, 279 Ga. 386, 387 (2) (612 SE2d 785) (2005). But see *Heywood v. State*, 292 Ga. 771, 774 (3) (743 SE2d 12) (2013) (holding that a defendant has no right to be present when only legal

19

arguments and logistical or procedural matters are discussed). However, "the right to be present may be waived if the defendant later acquiesces in the proceedings occurring in his absence," *Jackson v. State*, 278 Ga. 235, 237 (3) (599 SE2d 129) (2004) (citation and punctuation omitted), and "[a]cquiescence may occur when counsel makes no objection and a defendant remains silent after he or she is made aware of the proceedings occurring in his or her absence," *Murphy*, 299 Ga. at 241 (2). And, in the absence of any controlling authority to the contrary, we reject Young's argument that his right to be present could not have been waived simply because this was a death penalty trial.

The record shows that Young was present throughout all of the voir dire, that he was present in the courtroom during each of the bench conferences at issue here, that the purpose of each was obvious from its inception or announced afterward by the trial court, that the result of each was announced in open court, and that neither Young nor his counsel ever objected. Accordingly, we conclude that the trial court did not err in concluding in its order

that Young acquiesced in the waiver of his presence that was made by his counsel. Cf. *Champ v. State*, 310 Ga. 832, 834-848 (2) (a, b, and c) (854 SE2d 706) (2021) (remanding where the trial court had not ruled on the defendant's acquiescence in counsel's waiver).

10. We reaffirm our prior case law rejecting claims like Young's regarding the process of qualifying jurors based on their death penalty views. See *Willis*, 304 Ga. at 694-695 (4).

11. Young argues that the trial court erred by excusing three prospective jurors based on their voir dire responses regarding their willingness to consider a death sentence. As we have explained:

> [T]he proper standard for determining the disqualification of a prospective juror based upon his views on capital punishment is whether the juror's views would prevent or substantially impair the performance of his duties as a juror in accordance with his instructions and his oath. This standard does not require that a juror's bias be proved with unmistakable clarity. Instead, the relevant inquiry on appeal is whether the trial court's finding that a prospective juror is disqualified is supported by the record as a whole. An appellate court . . . must pay deference to the trial court's determination. This deference encompasses the trial court's resolution of any equivocations and conflicts in the prospective jurors' responses on voir dire. Whether to strike a juror for cause is within the discretion of the trial court and the trial court's rulings are proper absent some manifest abuse of

discretion.

*Humphreys v. State*, 287 Ga. 63, 71-72 (5) (694 SE2d 316) (2010) (citations and punctuation omitted), disapproved on other grounds by *Willis*, 304 Ga. at 706 (11) (a) n.3. See also W*illis*, 304 Ga. at 698 (9) ("[T]he erroneous exclusion from the list from which a defendant's jury is selected of a single prospective juror based on his or her purported unwillingness to consider a death sentence mandates the reversal of a death sentence."). After our careful review of the voir dire of the jurors at issue, we conclude that the trial court did not abuse its discretion by excusing them.

12. Young also argues that the trial court erred by refusing to excuse eight prospective jurors based on their voir dire responses regarding the death penalty. First, applying the same standards set forth in Division 11, and after our careful review of the voir dire of the jurors in question, we conclude that the trial court did not abuse its discretion. See *Humphreys*, 287 Ga. at 72 (5) ("The same standard applies to a court's decision to qualify a prospective juror over defendant's objection." (citation and punctuation omitted)).

22

Furthermore, declining Young's invitation to overrule our recent holding to the contrary, we conclude that any error regarding these jurors would have been harmless because none of them served on the 12-person jury that rendered the verdicts in Young's case. See *Willis*, 304 Ga. at 701-707 (11).

13. Young argues that the trial court improperly limited voir dire regarding prospective jurors' willingness to consider a sentence less than death upon a conviction for murder, as distinguished from cases where a complete defense has been proven or where only a lesser crime has been proven. First, we conclude that this issue was waived for the purposes of ordinary appellate review by Young's failure to object at the time of the announced limitations on his voir dire. See *Martin v. State*, 298 Ga. 259, 278-279 (6) (d) (779 SE2d 342) (2015), disapproved on other grounds by *Willis,* 304 Ga. at 706 (11) (a) n.3; *Braley v. State*, 276 Ga. 47, 52 (18) (572 SE2d 583) (2002).[5] Furthermore, our review of the voir dire reveals that the

---

[5] In *Martin*, we explained that a special form of review applies to cases where a death sentence has been imposed. We stated:

23

trial court, rather than disallowing Young's questions, simply directed him to make his questions more focused, and we therefore conclude that the trial court did not abuse its discretion. See *Arrington*, 286 Ga. at 338 (7) ("The scope of voir dire is generally a matter for the trial court's discretion.").

14. Young argues that the trial court improperly limited his voir dire of one juror on the subject of the juror's views on intellectual disability. The trial court, after correctly noting that similar questioning of the juror had already been allowed, simply instructed Young to "rephrase [his] question" and specifically authorized Young to "go into something more deeply" on the issue. At that point, Young raised no objection to the trial court's instructions but instead stated: "[W]e'll move on from that. We got

---

> This form of review in death penalty cases arises not from any ordinary appellate review principle; instead, it arises from the statutory mandate for this Court to ensure that no death sentence is "imposed under the influence of passion, prejudice, or any other arbitrary factor." OCGA § 17-10-35 (c) (1).

*Martin*, 298 Ga. at 278 (6) (d). We also explained that this special review "include[s] a plenary review of the record" that "guards against any obvious impropriety at trial, whether objected to or not, that in reasonable probability led to the jury's decision to impose a death sentence." Id. at 279 (6) (d). We conduct this special review below in Division 49.

enough questions on that. . . ." Accordingly, we hold that this claim has been waived for the purposes of ordinary appellate review. See *Martin*, 298 Ga. at 278-279 (6) (d); *Braley*, 276 Ga. at 52 (18). Furthermore, we conclude that the trial court did not abuse its discretion. See *Arrington*, 286 Ga. at 338 (7) ("The scope of voir dire is generally a matter for the trial court's discretion.").

*Issues Related to the Guilt/Innocence Phase*

15. There is no merit to Young's argument that Georgia's murder statute, OCGA § 16-5-1, is unconstitutional. See *Lamar v. State*, 278 Ga. 150, 155 (10) (598 SE2d 488) (2004).

16. Young argues that his constitutional rights were violated by the placement of an electronic stun belt on him during his trial. Young filed a pretrial motion objecting to the use of such a stun belt for security purposes at his trial, and the trial court ruled, with Young present, that the issue was moot because no stun belt was being used at the time. However, the trial court stated that it would conduct a hearing on the issue if the use of a stun belt were requested in the future. About halfway through the guilt/innocence

25

phase of the trial, while the trial court, again in Young's presence, was hearing arguments regarding a juror who was afraid of Young, the prosecutor stated: "[O]bviously [the juror] doesn't know that Mr. Young's wearing a shock belt. . . ." The prosecutor's statement was then reinforced in the State's brief filed in the trial court in response to Young's motion to remove this fearful juror. That brief stated: "The jurors do not have the knowledge that the Court, State, and Defendant have with respect to the 'shock belt' device that the Defendant is wearing underneath his non jail-garb clothing." Although the defendant himself obviously was aware that he was wearing the stun belt from the beginning and that defense counsel were aware of it *at least* from the time of the hearing and the State's brief, no concern regarding the stun belt was ever raised by Young or his counsel during the trial.

After Young raised the issue of the stun belt for the first time in his third amendment to his motion for new trial, the trial court conducted a hearing on the matter. In its order denying the claim, despite Young's testimony at the hearing that the stun belt made

26

him "uncomfortable" and "scared" and prevented him from speaking directly to the two of his three attorneys who were seated farther down the defense table, the trial court noted that Young also "testified that the stun belt did not prevent him from speaking to or conferring with his third attorney who sat next to him throughout the trial." The court also noted that this third attorney testified that she indeed spoke to Young during the trial, and the court further noted that the attorney "said nothing about any anxiety or reluctance [on Young's part] to speak with her." Based on this evidence, the trial court found that "there is no credible evidence that the stun belt had any effect, adverse or otherwise, on the defendant's Sixth Amendment and due process rights to be present at trial and to participate in his defense."

Furthermore, the trial court noted other testimony at the hearing showing that the deputies who fitted Young with the stun belt explained to Young "the operation of the stun belt and what would have to occur before it was used," explained to Young that he "would be warned or given instructions before the belt was ever

27

activated," and explained to Young the circumstances that would warrant the use of the stun belt, which did not include anything about Young's speaking to his attorneys. The court further noted testimony showing that "care was taken to be sure the device did not fit too tightly" and that Young "never complained . . . about the belt being uncomfortable or preventing him from communicating with his attorneys." Based on these findings, the court finally concluded: "The constitutional rights of the defendant to counsel and to participate in his defense were not impacted by the use of the stun belt."

As to any portion of this claim regarding the stun belt that is related to the time period *following* the hearing regarding a fearful juror in which the State specifically noted that Young was wearing the belt, we conclude that the claim was waived for the purposes of ordinary appellate review by Young's failure to raise it. See *Martin*, 298 Ga. at 278-279 (6) (d); *Weldon v. State*, 297 Ga. 537, 541 (775 SE2d 522) (2015) ("Failure to raise the issue [regarding a stun belt] deprives the trial court of the opportunity to take appropriate

28

remedial action and waives appellate review of any alleged impropriety."). Cf. *People v. Harris*, 904 NE2d 1200, 1206-1207 (III) (Ill. App. Ct. 2009) (holding that a similar issue was amenable to that court's plain error review, which is analogous to the review we conduct below in the Sentence Review section of this opinion). To the extent that this waiver might not apply to the time period *prior to* the hearing regarding the fearful juror because defense counsel were entitled to rely on the trial court's original ruling that any use of a stun belt would only follow a request for that security measure and a hearing on the matter, we conclude, based on the trial court's findings in its order denying Young's motion for new trial, that the lack of such a hearing was harmless beyond a reasonable doubt and therefore does not require a new trial. See *Chapman v. California*, 386 U. S. 18, 24 (III) (87 SCt 824, 17 LE2d 705) (1967) (holding that, in general, constitutional violations require reversal unless found to be harmless beyond a reasonable doubt). Cf. *United States v. Durham*, 287 F3d 1297, 1308-1309 (D) (11th Cir. 2002) (applying a harmless beyond a reasonable doubt standard of review to a claim

regarding a stun belt); *State v. Bates*, 125 P3d 42, 47 (Or. Ct. App.

2005) (concluding "that there is little likelihood that the verdict was

affected by any inhibition defendant may have experienced as a

result of being required to wear the stun belt" and "that any error

was harmless beyond a reasonable doubt").[6]

17. The trial court did not abuse its discretion in denying

Young's motion in limine regarding testimony from Doris Jones

describing signs of a forced entry into the victim's laundry room

prior to the day of the murder on grounds of relevance and the

allegedly speculative nature of that testimony, particularly in light

of the other evidence showing that Young had driven to the home

prior to the day of the murder. See *Crozier v. State*, 263 Ga. 866,

867 (2) (440 SE2d 635) (1994) ("Any evidence is relevant which

logically tends to prove or to disprove a material fact which is at

issue in the case, and every act or circumstance serving to elucidate

or to throw light upon a material issue or issues is relevant. . . . The

---

[6] We do not endorse, however, the State's failure to comply with the
trial court's pretrial order regarding the use of a shock belt.

trial court has great discretion to determine relevancy and materiality of evidence, and admission is favored in doubtful cases." (citation and punctuation omitted)). Insofar as Young's additional oral objection to the testimony also addressed a hearsay account of the victim's whereabouts on the night of the crime from his girlfriend, we see no reversible error, because the testimony was "cumulative of legally admissible evidence" from the girlfriend herself. *Wright v. State*, 291 Ga. 869, 872 (3) (a) (734 SE2d 876) (2012) (citation and punctuation omitted).

18. The trial court did not abuse its discretion in applying the former necessity exception to the hearsay rule to allow testimony from Doris Jones regarding a statement that the victim had made to her about a warning he had given to Young regarding Young's possibly "putting his hands on" her. See *Jennings v. State*, 288 Ga. 120, 121-122 (3) (702 SE2d 151) (2010).[7]

---

[7] We note that Young's trial was not governed by Georgia's current Evidence Code, which took effect on January 1, 2013. See *Parker v. State*, 296 Ga. 586, 588 (1) (769 SE2d 329) (2015) (citing Ga. L. 2011, p. 99, § 101).

19. Young's claim regarding the absence of a warrant to obtain location data for his cell phone was waived for the purposes of ordinary appellate review by his failure to raise the issue at trial. See *Martin*, 298 Ga. at 278-279 (6) (d). See also *Carpenter v. United States*, __ U. S. __, __ (IV) (138 SCt 2206, 2222, 201 LE2d 507) (2018) (addressing the privacy of cell phone location data).

20. Young's claim regarding the probative value versus the prejudicial effect of a recorded 911 call from Doris Jones has been waived for the purposes of ordinary appellate review by his failure to object at trial. See *Martin*, 298 Ga. at 278-279 (6) (d); *Bryant v. State*, 288 Ga. 876, 887 (8) (c) (708 SE2d 362) (2011).

21. Young argues that testimony from Doris Jones regarding a statement from her sister recounting a report from a third person about Young's whereabouts during the crimes, along with certain testimony from Annie Sampson, Sonny Goodson, Wesley Horne, Leo Rivers, and Latrice Rivers, constituted improper hearsay testimony. These claims were waived for the purposes of ordinary appellate

review by Young's failure to object at trial.[8]  See *Martin*, 298 Ga. at 278-279 (6) (d); *Bryant*, 288 Ga. at 887 (8) (c).

22.  Young argues that an investigator gave speculative and improper opinion testimony by stating that it would have been "understandable" for Young to have been in Georgia and that it would have been "natural" for Young freely to admit as much, because, as Young had told the investigator, Young had been to Georgia in the past.  First, this issue was waived for the purposes of ordinary appellate review by Young's failure to object at trial.  See *Martin*, 298 Ga. at 278-279 (6) (d); *Bryant*, 288 Ga. at 887 (8) (c).  And, in any event, the testimony was not improper.  See *Harris v.*

---

[8] Young concedes that his hearsay argument regarding Annie Sampson was not preserved for ordinary appellate review.  Our own review of the record reveals that the trial court's order reconstructing portions of the record concluded that a hearsay objection *was* raised in the bench conferences held during Ms. Sampson's testimony.  See OCGA § 5-6-41 (f) (providing for amendments to the record).  However, Young's "Proposed Record Reconstruction and Request for Hearing" stated that neither party could "recall the substance of the objection," and, in keeping with that representation, the trial court made no finding regarding what the substance of the hearsay objection might have concerned.  Because there is no record of what specific hearsay objection was raised or why it was denied, we accept Young's concession on appeal that the issue was not preserved for ordinary appellate review.

*State*, 279 Ga. 304, 305-306 (1) (612 SE2d 789) (2005) ("A lay witness may relate his or her opinion as to the existence of any fact so long as the opinion is based upon the person's own experiences and observations, and so long as the matter referred to is within the scope of the average juror's knowledge.").

23. The trial court did not abuse its discretion in admitting photographs of the victim taken during his autopsy while medical instruments were used to retract tissue in order to reveal relevant injuries. See *Brown v. State*, 250 Ga. 862, 867 (5) (302 SE2d 347) (1983) ("A photograph which depicts the victim after autopsy incisions are made or after the state of the body is changed by authorities or the pathologist will not be admissible unless necessary to show some material fact which becomes apparent only because of the autopsy."), abrogated by the current Evidence Code as stated in *Venturino v. State*, 306 Ga. 391, 396 (2) (b) (830 SE2d 110) (2019). See also *Bunnell v. State*, 292 Ga. 253, 258 (5) (735 SE2d 281) (2013) (noting a trial court's discretion regarding autopsy photographs); *Simmons v. State*, 291 Ga. 705, 711 (8) (b) (733 SE2d

280) (2012) (addressing photographs taken during the use of medical instruments such as forceps). This holding is not changed by the fact that Young's trial strategy included an admission of his guilt, because the State was entitled to prove its case for guilt rather than to rely on Young's admissions. See *Morgan v. State*, 307 Ga. 889, 896 (3) (b) (838 SE2d 878) (2020) ("[A] criminal defendant may not stipulate or admit his way out of the full evidentiary force of the case as the State chooses to present it." (citation and punctuation omitted)).

24. During the guilt/innocence phase, a witness testified that she had been Young's friend for over ten years and that their relationship had at some points been sexual. In addition to corroborating several of the details of the State's evidence regarding Young's whereabouts and cell phone calls near the time of the murder, the witness also testified that Young came to her house on the day following the murder after he got off work and that she then saw him again later that night at his house. With no contemporaneous objection from Young, the State asked her if she

and Young had sex that night, and she answered affirmatively.

After this testimony was concluded and after a lunch break, defense counsel argued that the testimony about the witness and Young having sex was improper because it was irrelevant to the question of Young's guilt. Defense counsel stated that Young was not seeking a curative instruction but instead was asking that the State be precluded from discussing the testimony about sex during its closing argument in the guilt/innocence phase on the ground that the testimony was irrelevant to the question of guilt but was highly prejudicial. The trial court ruled:

> Well, I can see that it would be corroborative in terms of Ms. [Doris] Jones' testimony about the defendant allegedly being unfaithful, that this would corroborate her perception of the nature of their relationship and why they would have arguments and to show that her testimony concerning his conduct, that would be evidence to support that her suspicions or her statements were well-founded. So I do find that it would have some corroborative value there. So in terms of just totally precluding them from arguing her testimony, I'm going to deny that request. I mean, anything can be argued in the wrong way. Anything can be – you can have incorrect argument, but I'm not going to preclude them from even mentioning it. They can't use it just to attack the character or whatever, but to, for the proper purpose that

36

I just described.

We conclude that the trial court did not abuse its discretion in ruling on Young's argument concerning the relevance of the witness's testimony to the question of guilt. See *Spiller v. State*, 282 Ga. 351, 354 (3) (647 SE2d 64) (2007) (holding that the trial court had not abused its discretion in allowing a certain inference to be made in a closing argument, because the "inference was a permissible one from the evidence presented at trial"). See also *Moore v. State*, 295 Ga. 709, 714 (3) (763 SE2d 670) (2014) (addressing the propriety of evidence that might incidentally place the character of the defendant at issue but is otherwise relevant).

Pursuant to the trial court's ruling on relevance, the State argued in its guilt/innocence phase closing argument, while arguing how various behaviors that Young was capable of were relevant to the various "adaptive functioning areas" used in considering a possible finding of intellectual disability: "And the fact, again, that he's able to have this other relationship with another woman shows that he is multi-faceted, and there's a lot more to Rodney Young than

what you've seen in this trial." To the extent that Young argues on appeal, in addition to the ground of relevance discussed above, that the State's argument regarding the issue of intellectual disability was unconstitutional, we conclude that the issue was waived for the purposes of ordinary appellate review by Young's failure to make this specific objection at trial. See *Martin*, 298 Ga. at 278-279 (6) (d).

25. Young argues that requiring him to prove his intellectual disability beyond a reasonable doubt in order to be exempted from a death sentence was unconstitutional. Seeing no clear direction in the law to hold otherwise, we adhere to our prior decisions upholding Georgia's standard of proof.

(a) In 1988, Georgia was the first state in the nation to enact a statutory ban on the execution of intellectually disabled persons. See OCGA § 17-7-131 (c) (3), (j) (as amended by Ga. L. 1988, p. 1003, § 1). In 1989, shortly after Georgia enacted this groundbreaking statute, the United States Supreme Court held that there was no similar protection in the United States Constitution. See *Penry v.*

38

*Lynaugh*, 492 U. S. 302 (109 SCt 2934, 106 LE2d 256) (1989). However, this Court held in 1989 that such a protection *did* exist under the Georgia Constitution and accordingly extended the new statutory protection to apply to persons tried in Georgia before the statute's effective date. See *Fleming v. Zant*, 259 Ga. 687, 690 (3) (386 SE2d 339) (1989) ("[*Penry*] was based in great part on the absence of any 'national consensus' against executing the mentally retarded. In contrast, the objective evidence indicates that a consensus against execution of the mentally retarded does exist among Georgians."). This Court then further extended Georgia's protection of intellectually disabled persons to those who could have but did not raise the issue at trial, concluding that allowing such defaulted claims in a prisoner's first state habeas proceeding was necessary to prevent a possible miscarriage of justice. See *Turpin v. Hill*, 269 Ga. 302, 303 (3) (b) (498 SE2d 52) (1998) (citing OCGA § 9-14-48 (d)). In 2002, the United States Supreme Court, concluding that a "national consensus" on the issue had developed in the 14 years since Georgia enacted its statutory protection for persons with

39

intellectual disabilities, overruled *Penry* and announced that the execution of intellectually disabled persons violated the United States Constitution. *Atkins v. Virginia*, 536 U. S. 304, 316 (III) (122 SCt 2242, 153 LE2d 335) (2002). See id. at 321 (IV) ("Construing and applying the Eighth Amendment in the light of our 'evolving standards of decency,' we therefore conclude that such punishment is excessive and that the [United States] Constitution 'places a substantive restriction on the State's power to take the life' of a mentally retarded offender." (quoting *Ford v. Wainwright*, 477 U. S. 399, 405 (II) (106 SCt 2595, 91 LE2d 335) (1986)).

(b) While Georgia was the first state to ban the execution of intellectually disabled persons, it has from the initial adoption of that ban imposed a burden to prove intellectual disability on defendants under a beyond a reasonable doubt standard.[9] This

---

[9] The Georgia Code provides: "The defendant may be found 'guilty but with intellectual disability' if the jury, or court acting as trier of facts, finds beyond a reasonable doubt that the defendant is guilty of the crime charged and is intellectually disabled." OCGA § 17-7-131 (c) (3) (as amended in 2017 to use the term "intellectual disability"). This Court has held: "[T]he plain language of OCGA § 17-7-131 (c) (3) requires that the defendant prove his

40

standard of proof has been challenged several times in this Court on constitutional grounds, particularly in light of the fact that some other states impose only a clear and convincing evidence standard on defendants seeking to prove their intellectual disability and the majority of states that still have the death penalty impose only a preponderance of the evidence standard on defendants. See *Raulerson v. Warden*, 928 F3d 987, 1013-1014 (I) (B) (11th Cir. 2019) (Jordan, J., concurring in part and dissenting in part) (discussing the varying standards of proof applied). This Court's last published decision upholding Georgia's standard of proof was in *Stripling v. State* in 2011. See 289 Ga. at 371 (1) ("We have previously addressed this very issue, and we now reiterate our prior holding that Georgia's beyond a reasonable doubt standard is not unconstitutional." (citing

mental retardation beyond a reasonable doubt. . . ." *Burgess v. State*, 264 Ga. 777, 789-790 (36) (450 SE2d 680) (1994). Although we initially directed that a preponderance of the evidence standard should be applied to claims of intellectual disability raised by habeas petitioners who had been tried prior to the effective date of the statutory protection, our later case law has strongly suggested that even those cases should *also* have employed the beyond a reasonable doubt standard. See *Hill*, 269 Ga. at 303-304 (4).

*Head v. Hill*, 277 Ga. 255, 260-263 (II) (B) (587 SE2d 613) (2003)).

In *Stripling*, we explained:

In addressing this issue previously, we first noted that, although the Supreme Court of the United States had recognized a constitutional right of mentally retarded defendants to be exempt from the death penalty, it had not directed the states to apply any particular burden of proof to claims of mental retardation. See *Atkins v. Virginia*, 536 U.S. 304 (122 SCt 2242, 153 LE2d 335) (2002) (identifying a national consensus against executing mentally retarded persons and holding that executing such persons was therefore unconstitutional). Instead, we noted that the Supreme Court "specifically left '"to the States the task of developing appropriate ways to enforce the (federal) constitutional restriction"' on executing the mentally retarded." *Hill*, 277 Ga. at 260 (II) (B) (quoting *Atkins*, 536 U. S. at 317 (III) (citation omitted)). See also *Bobby v. Bies*, __ U. S. __, __ (I) (129 SC 2145, 2150 (I), 173 LEd2d 1173) (2009) ("Our opinion [in *Atkins*] did not provide definitive procedural or substantive guides for determining when a person who claims mental retardation 'will be so impaired as to fall (within *Atkins*' compass).'" (quoting *Atkins*, 536 U. S. at 317 (III)). . . .

*Stripling*, 289 Ga. at 371-372 (1). We reaffirmed our prior holding that claims of intellectual disability are more closely analogous to claims of insanity, which the Supreme Court has held could be subjected to a beyond a reasonable doubt standard, than they were

42

to claims of incompetence to stand trial, which the Supreme Court has held could not be subjected to a standard higher than a preponderance of the evidence. See id. at 372 (1) (discussing *Leland v. Oregon,* 343 U. S. 790 (72 SCt 1002, 96 LE 1302) (1952), and *Cooper v. Oklahoma,* 517 U. S. 348 (116 SCt 1373, 134 LE2d 498) (1996)). We concluded our discussion regarding the purely procedural aspect of the standards that we were reaffirming by stating:

> Thus, in light of the specific statement by the Supreme Court that it had not established any particular procedural standards that must be applied to mental retardation, the similarity of mental retardation claims to claims of insanity at the time of the commission of crimes, and the persuasive effect of having sister states who have refused to declare the preponderance of the evidence standard to be constitutionally required, we held that Georgia's beyond a reasonable doubt standard was not unconstitutional from a procedural point of view.

Id. at 372-373 (1).

After concluding our analysis of Georgia's standard of proof on procedural grounds, we also reaffirmed our prior holding

> that Georgia's beyond a reasonable doubt standard further served to *define* the category of mental

43

retardation within Georgia law and that, in [setting this standard], Georgia had not acted outside the bounds of the national consensus about the treatment of mentally retarded persons identified by the Supreme Court in *Atkins*.

*Stripling*, 289 Ga. at 373 (1). We further noted that "Georgia was not alone in defining mental retardation through the use of a heightened standard of proof at the time of *Atkins*" and that the several states at that time applying a clear and convincing evidence standard had been counted among the states forming a national consensus. *Stripling*, 289 Ga. at 373 (1). We observed:

[T]he Supreme Court noted as follows:

To the extent there is serious disagreement about the execution of mentally retarded offenders, it is in determining which offenders are in fact retarded. . . . Not all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom there is a national consensus.

Id. at 374 (1) (quoting *Atkins*, 536 U. S. at 317 (III)). We concluded this portion of our analysis by stating:

Therefore, we reaffirm that Georgia's statutory definition of mental retardation, with its requirement that only

mental deficiencies capable of proof beyond a reasonable doubt [qualify for protection], is not unconstitutional under *Atkins*.

Id.

(c) (i) First, Young assails our prior holdings affirming Georgia's beyond a reasonable doubt standard in reference to the second portion of the analysis set forth in *Stripling*, which addressed the matter from a more substantive perspective. The United States Supreme Court has recently stated: "In *Atkins v. Virginia*, we held that the Constitution 'restrict[s] . . . the State's power to take the life of' *any* intellectually disabled individual." *Moore v. Texas*, __ U. S. __, __ (II) (137 SCt 1039, 1048, 197 LE2d 416) (2017). Accordingly, we disapprove anything in our prior decisions suggesting otherwise, particularly those parts of our prior decisions suggesting that "Georgia's beyond a reasonable doubt standard further served to *define* the category of mental retardation." *Stripling*, 289 Ga. at 373 (1). See *Atkins*, 536 U. S. at 317 (III); *Hill*, 277 Ga. at 262 (II) (B). See also *Williams v. Cahill*, 303 P3d 532, 550 (Ariz. Ct. App. 2013) (Eckerstrom, P.J., dissenting) ("But this paragraph [from *Atkins*], by

its terms, only invites states to develop 'ways to enforce' the constitutional restriction imposed in *Atkins*. No part of that language suggests the states are likewise entrusted with the power to redefine the substance of the constitutional restriction itself."). While we continue to take some guidance from the Supreme Court's observation that there is disagreement among the states "in determining which offenders are in fact retarded," we acknowledge that this observation is relevant only to the *procedures* for determining whether defendants are intellectually disabled and that every state is constitutionally required to recognize prevailing clinical definitions of intellectual disability in defining the category of persons who are constitutionally protected, including those who are "mildly mentally retarded." *Atkins*, 536 U. S. at 308 (I), 317 (III). See *Moore*, 137 SCt at 1049 (II) ("*Hall* indicated that being informed by the medical community does not demand adherence to everything stated in the latest medical guide. But neither does our precedent license disregard of current medical standards."); *Hall v. Florida*, 572 U. S. 701, 720-721 (III) (C) (134 SCt 1986, 188 LE2d 1007)

(2014) ("If the States were to have complete autonomy to define intellectual disability as they wished, the Court's decision in *Atkins* could become a nullity, and the Eighth Amendment's protection of human dignity would not become a reality. This Court thus reads *Atkins* to provide substantial guidance on the definition of intellectual disability."). On this point, we emphasize that Georgia, by statute and through case law, has always applied such prevailing clinical standards. See, e.g., *Stripling v. State*, 261 Ga. 1, 4 (3) (b) (401 SE2d 500) (1991). See also *Hill v. Humphrey*, 662 F3d 1335, 1352 (III) (D) (11th Cir. 2011) ("It is undisputed that Georgia's statutory definition of mental retardation is consistent with the clinical definitions cited in *Atkins*.").

(ii) We turn now to the *procedural* issue that Young raises regarding the constitutionality of Georgia's standard of proof. On this question, we begin and end with the Supreme Court's statement in *Atkins* that it "'l[eft] to the States the task of developing appropriate ways to enforce the [federal] constitutional restriction'" on executing intellectually disabled persons. *Atkins*, 536 U. S. at

47

317 (III) (quoting *Ford*, 477 U. S. at 416 (V) (A) (plurality portion of opinion)).[10]   We acknowledge that the states' freedom to develop appropriate procedures does not leave them unfettered from general constitutional principles, but we conclude, despite Young's arguments to the contrary discussed below,[11] that it does permit the procedure that the Georgia General Assembly has chosen.

First, Young argues that the Supreme Court's recent decisions in *Hall v. Florida* and *Moore v. Texas* require this Court's disapproval of Georgia's beyond a reasonable doubt standard.  See *Moore*, 137 SCt 1039 (addressing the "wholly nonclinical" factors

---

[10] We again emphasize that the *substantive* question of intellectual disability is not at issue here.  As the Supreme Court has stated about its principle of leaving to the states the responsibility for creating appropriate procedures:  "Fidelity to this important principle of federalism, however, should not be construed to demean the substantive character of the federal right at issue." *Montgomery v. Louisiana*, 577 U. S. 190, 211 (III) (136 SCt 718, 193 LE2d 599) (2016).  See *People v. Vasquez*, 84 P3d 1019, 1022 (III) (B) (1) (Colo. 2004) ("Atkins placed a '*substantive* restriction on the State's power to take the life of a mentally retarded offender.' *Atkins*, 536 U.S. at 321 (internal quotation marks omitted) (emphasis added).  Far from announcing a procedural rule, *Atkins* merely declared that the Eighth Amendment now prohibits the execution of the mentally retarded.  Id.").

[11] We also consider here the parallel arguments made by the amici curiae, The Arc of the United States, The Arc of Georgia, and the Georgia Advocacy Office.

that Texas applied); *Hall*, 572 U. S. 701 (addressing a "strict IQ score cutoff" applied by Florida). We have considered these decisions carefully, especially as discussed in this opinion regarding the *procedural* question of Georgia's standard of proof. However, we note that they directly addressed only questions regarding the *substantive* definition of intellectual disability and the requirement that states must, as Georgia indisputably does, adhere to prevailing clinical definitions of intellectual disability in fashioning such a definition. Thus, if this Court's precedents regarding the beyond a reasonable doubt standard are somehow incorrect, it would not be because of the core holding of *Hall* or *Moore*.

Next, Young argues that this Court has previously relied on inapposite case law from the United States Supreme Court in upholding the beyond a reasonable doubt standard. As we noted above, we have previously discussed the Supreme Court decisions of *Cooper v. Oklahoma* and *Leland v. Oregon* as being relevant to our evaluation of the constitutionality of Georgia's beyond a reasonable doubt standard. See *Cooper*, 517 U. S. 348; *Leland*, 343 U. S. 790.

49

See also *Stripling*, 289 Ga. at 372 (1) (discussing *Cooper* and *Leland*); *Hill*, 277 Ga. at 261 (II) (B) (same). Despite Young's arguments that we should do otherwise, and although we acknowledge that neither case is a perfect fit to answer the question presented here, we continue to take more guidance from *Leland* than from *Cooper*.

In *Cooper*, the Supreme Court held as a matter of federal due process that a defendant could not be required to prove his or her incompetence to stand trial by clear and convincing evidence. See *Cooper*, 517 U. S. at 350, 369 (V). Cf. id. at 355 (II) ("Our recent decision in *Medina v. California*, 505 U.S. 437, 120 L. Ed. 2d 353, 112 S. Ct. 2572 (1992), establishes that a State may presume that the defendant is competent and require him to shoulder the burden of proving his incompetence by a preponderance of the evidence. Id., at 449."). The Supreme Court noted that "[n]o one questions the existence of the fundamental right" involved, id. at 354 (II), and we conclude that in this regard *Cooper* is relevant to the issue of intellectual disability, because the right of intellectually disabled

50

persons not to be executed has also been made a clear constitutional

right.[12] Likewise, the issue in *Cooper* and the issue here both involve

consideration of the risks arising from a potentially erroneous

finding of fact. See id. at 362-368 (IV and V).[13] However, the

Supreme Court emphasized in *Cooper* the historical basis for the

right to not be tried while incompetent and the historical basis in

English and American common law for requiring defendants to

---

[12] We note here Young's argument that this Court first deemed *Leland* to be more persuasive than *Cooper* on the issue of a standard of proof for intellectual disability prior to the Supreme Court's announcement of the relevant *federal* constitutional right. However, we point out that this Court has already addressed this issue, and we remain mindful of it as we reach our conclusions here. See *Hill*, 277 Ga. at 260 (II) (B) ("Now that the Georgia exemption from death sentences for mentally retarded persons is paralleled by a new federal exemption, we must determine whether, under the authority of federal constitutional law, the beyond a reasonable doubt standard continues to be an acceptable standard of proof to apply to mental retardation claims." (emphasis omitted)).

[13] We note here Young's extensive argument regarding statistics concerning claims of intellectual disability in Georgia; however, we agree with the Eleventh Circuit in holding that statistics like Young's are neither complete nor constitutionally compelling. See *Hill*, 662 F3d at 1357 (F) ("[E]ven if one were to consider the dissent's skewed data, the fact remains that reported cases in Georgia actually show that judges and juries do find defendants guilty but mentally retarded under Georgia's proof beyond a reasonable doubt standard."). It is important to note in this regard that cases in which intellectually disabled persons are never charged with crimes, resolve charges without a trial, or obtain a not guilty verdict from a jury would rarely if ever result in reported judicial decisions and thus would not be included in the statistics that Young offers here.

51

prove their incompetence only by a preponderance of the evidence. See id. at 354-360 (II and III). And it was in reference to this historical basis for the right at issue that the Supreme Court noted the fact that "[o]nly 4 of the 50 States" imposed the higher burden of proof at issue. Id. at 360 (III). See also id. at 362 (III) ("The near-uniform application of a standard that is more protective of the defendant's rights than Oklahoma's clear and convincing evidence rule supports our conclusion that the heightened standard offends a principle of justice that is deeply 'rooted in the traditions and conscience of our people.' *Medina v. California*, 505 U.S. at 445 (internal quotation marks omitted)."). In contrast, such historical support is absent for claims of intellectual disability, as well summarized by the Eleventh Circuit:

> In contrast, there is no historical right (in the Eighth Amendment or elsewhere) of a mentally retarded person not to be executed. And since the constitutional right itself is new, there is no historical tradition regarding the burden of proof as to that right. As recently as 1989, *Penry* refused to bar the execution of the mentally retarded. *Atkins* was based not on historical tradition or the Due Process Clause, but on the contemporary national consensus that reflected "the evolving standards of

52

decency" that informed the meaning of the Eighth Amendment. *Atkins*, 536 U.S. at 311-12, 122 S. Ct. at 2247. Indeed, Georgia's reasonable doubt standard for establishing a mental retardation exception to the death penalty, which was enacted twenty-three years ago, is the oldest such law in the nation. Although other states recently have employed either clear and convincing evidence or preponderance of evidence standards, no more lenient standard of proof predates Georgia's.

*Hill*, 662 F3d at 1350-1351 (III) (C). See also *Raulerson*, 928 F3d at 1002 (III) (B) (2) ("Unlike the right at issue in *Cooper*, which has its deep roots in our common-law heritage, there is no historical right of an intellectually disabled person not to be executed.").[14]

We turn next to an examination of our prior decisions insofar as they identified limited guidance on the constitutionality of Georgia's standard of proof in *Leland*. The United States Supreme Court began its analysis in *Leland* by noting that there was at least

---

[14] We note that, if *Cooper*'s holding applied in this context with full force, the laws of the states where a clear and convincing standard applies would also be unconstitutional. See also *Hill*, 662 F3d at 1355 (III) (E) ("The effective result of Hill's argument, then, is that every state's death penalty statute or case law procedure is unconstitutional because none of them requires the state to prove the absence of mental retardation beyond a reasonable doubt. Or, to take Hill's argument to its logical conclusion, beyond all doubt.").

some historical precedent supporting Oregon's beyond a reasonable doubt standard for insanity claims, noting the origin of Oregon's statutory rule in 1864, the announcement in 1843 in England of a rule requiring such claims to be "clearly proved," and the requirement applied in "most of the nineteenth-century American cases" that a defendant "'clearly' prove insanity." *Leland*, 343 U. S. at 796-797. The Court also noted that it had previously adopted a rule, through its supervisory authority over the federal courts, requiring an acquittal in federal prosecutions whenever "'there is reasonable doubt whether [the defendant] was capable in law of committing crime,'" id. at 797 (quoting *Davis v. United States*, 160 U. S. 469, 484 (16 SCt 353, 40 LE 499) (1895)); however, the Court emphasized that its holding in *Davis* "obviously establishes no constitutional doctrine, but only the rule to be followed in federal courts," id.

The Supreme Court in *Leland* noted the central fact at issue, which was that "Oregon [wa]s the only state that require[d] the accused, on a plea of insanity, to establish that defense beyond a

54

reasonable doubt." *Leland*, 343 U. S. at 798. The Court noted that "[s]ome twenty states" required defendants "to establish [their] insanity by a preponderance of the evidence or some similar measure of persuasion." Id. Nevertheless, the Court, in comparing Oregon's beyond a reasonable doubt standard with these preponderance standards, held:

> While there is an evident distinction between these two rules as to the quantum of proof required, we see no practical difference of such magnitude as to be significant in determining the constitutional question we face here.

Id. And yet, while not "significant" to the ultimate question, the Court stated, in words that warrant attention in Young's case given the number of American jurisdictions that employ standards of proof for intellectual disability that are different from Georgia's:

> The fact that a practice is followed by a large number of states is *not conclusive* in a decision as to whether that practice accords with due process, but it is *plainly worth considering* in determining whether the practice "offends some principle of justice so rooted in the traditions and conscience of our people as to be ranked as fundamental." *Snyder v. Massachusetts*, 291 U.S. 97, 105 (1934).

Id. (emphasis supplied). See *Raulerson*, 928 F3d at 1013-1014 (I)

55

(B) (Jordan, J., concurring in part and dissenting in part) (discussing the various standards of proof applied in different jurisdictions).

The Court, again noting its own contrary rule for the federal courts, held regarding Oregon's standard of proof:

> But "its procedure does not run afoul of the Fourteenth Amendment because another method may seem to our thinking to be fairer or wiser or to give a surer promise of protection to the prisoner at the bar." *Snyder v. Massachusetts*, supra, at 105.

*Leland*, 343 U. S. at 799. The Court concluded:

> We are therefore reluctant to interfere with Oregon's determination of its policy with respect to the burden of proof on the issue of sanity since we cannot say that policy violates generally accepted concepts of basic standards of justice.

Id.

We note, in deciding the degree of guidance to be gained in Young's case from *Leland*, that *Leland* was not a case involving an underlying right that the Supreme Court had specifically "held to be secured to defendants in federal courts by the Bill of Rights." *Leland*, 343 U. S. at 798. See also *Medina v. California*, 505 U. S. 437, 449 (112 SCt 2572, 120 LE2d 353) (1992) ("Moreover, while the

Due Process Clause affords an incompetent defendant the right not to be tried, we have not said that the Constitution requires the States to recognize the insanity defense." (citations omitted)). But we also note that the Supreme Court has since clarified that *some* acceptable definition of insanity is constitutionally required. See *Kahler v. Kansas*, __ U. S. __, __ (II) (A) (140 SCt 1021, 1028-1029, 206 LE2d 312) (2020) ("A State's 'insanity rule[ ] is substantially open to state choice.'" (quoting *Clark v. Arizona*, 548 U. S. 735, 752 (II) (A) (126 SCt 2709, 165 LE2d 842) (2006))). See also id. at 1039 (II) (Breyer, J., dissenting) ("The Court contends that the historical formulations of the insanity defense were so diverse, so contested, as to make it impossible to discern a unified principle that Kansas' approach offends. I disagree."). In the end, while we see reason for some circumspection in applying *Leland*, we also note that some form of due process concerns regarding standards of proof were clearly at issue in the case. Thus, although both the United States Constitution and the Georgia Constitution now clearly protect persons with intellectual disabilities from execution, we consider the

due process analysis in *Leland* worthy of our consideration here, particularly given our conclusion that intellectual disability "is comparable to a claim of insanity at the time of the crime in that both relieve a guilty person of at least some of the statutory penalty to which he would otherwise be subject." *Hill*, 277 Ga. at 261 (II) (B).

While identifying some guidance in *Leland*, we focus most directly on the guidance given by the Supreme Court specifically on the question at hand. As noted above, the Supreme Court in *Atkins*, quoting *Ford v. Wainwright*, expressly "l[eft] to the States the task of developing appropriate ways to enforce the [federal] constitutional restriction'" on executing intellectually disabled persons. *Atkins*, 536 U. S. at 317 (III) (quoting *Ford*, 477 U. S. at 416 (V) (A) (plurality portion of opinion)). See also *Jones v. Mississippi*, No. 18-1259, 2021 U.S. LEXIS 2110, at *26-27 (II) (B) (Apr. 22, 2021) ("[A]s the Court explained in *Montgomery*, when 'a new substantive rule of constitutional law is established, this Court is careful to limit the scope of any attendant procedural requirement

58

to avoid intruding more than necessary upon the States' sovereign administration of their criminal justice systems.'" (quoting *Montgomery v. Louisiana*, 577 U. S. 190, 211 (III) (136 SCt 718, 193 LE2d 599) (2016) (citing *Ford*, 477 U. S. at 416-417 (V) (A) (plurality portion of opinion)))). The Supreme Court's choice of *Ford* as a lodestar makes sense, because *Ford*, like *Atkins*, addressed the possible execution of a person with severe mental deficiencies that significantly undermined the penological justifications for the person's execution. The protection announced in *Atkins* was centered on a defendant's mental state at the time of his or her crime and the time of his or her trial, while *Ford* was centered on a condemned prisoner's mental state at the time of his or her actual execution. But the legal similarities between the two were clearly what commended *Ford* to the *Atkins* Court.[15]

---

[15] We note that *Ford* directly addressed the question of whether Ford had a right to an evidentiary hearing on federal habeas review; however, both the plurality opinion and the concurring opinion in that case clearly indicate that the procedural due process necessary to enforce a clear Eighth Amendment right was at the core of the analysis. See *Ford*, 477 U. S. at 410 (III) (plurality portion of opinion) ("Once a substantive right or restriction is recognized in the

Like the *Atkins* Court did regarding intellectual disability, the majority in *Ford* began with the conclusion that the execution of mentally incompetent persons violated the Eighth Amendment. See *Ford*, 477 U. S. at 401 (majority portion of opinion) ("For centuries no jurisdiction has countenanced the execution of the insane, yet this Court has never decided whether the Constitution forbids the practice. Today we keep faith with our common-law heritage in holding that it does."). Thus, the Court's decision to "leave to the States the task of developing appropriate ways to enforce the [federal] constitutional restriction" in *Ford* cannot be distinguished from Young's case based on the nature of the underlying right at issue. *Ford*, 477 U. S. at 416 (V) (A) (plurality portion of opinion).

Our task in applying *Ford* here is complicated somewhat by the fact that the portion of *Ford* directly quoted in *Atkins* was concurred

Constitution, therefore, its enforcement is in no way confined to the rudimentary process deemed inadequate in ages past."); id. at 424 (II) (Powell, J., concurring in part and concurring in the judgment) ("At least in the context of competency determinations prior to execution, this standard is no different from the protection afforded by procedural due process. . . . Thus, the question in this case is whether Florida's procedures for determining petitioner's sanity comport with the requirements of due process.").

in by only a plurality of the Supreme Court. See *Atkins*, 536 U. S. at 317 (III) (quoting *Ford*, 477 U. S. at 416 (V) (A) (plurality portion of opinion)). However, even assuming that the *Atkins* majority meant to embrace the details of the *Ford* plurality's reasoning to the exclusion of the somewhat more accommodating reasoning in *Ford*'s concurring opinion, we conclude that *Ford* supports our decision here.[16] In concluding that Florida's procedure was constitutionally inadequate, the *Ford* plurality identified the following faults: "no court played any role in the rejection of [Ford]'s claim of insanity"; the decision was made "wholly within the executive branch, *ex*

---

[16] We note that the concurring opinion noted similar defects in Florida's procedures but differed with the plurality mainly by providing a prescription for procedures that was even less restrictive on the states than the plurality's prescription. To that end, the concurring opinion stated:

> We need not determine the precise limits that due process imposes in this area. In general, however, my view is that a constitutionally acceptable procedure may be far less formal than a trial. The State should provide an impartial officer or board that can receive evidence and argument from the prisoner's counsel, including expert psychiatric evidence that may differ from the State's own psychiatric examination. Beyond these basic requirements, the States should have substantial leeway to determine what process best balances the various interests at stake. As long as basic fairness is observed, I would find due process satisfied. . . .

*Ford*, 477 U. S. at 427 (III) (Powell, J., concurring in part and concurring in the judgment).

*parte*"; the Governor had announced a policy of excluding all advocacy on prisoners' behalf; and the Governor refused to inform Ford's counsel whether he had considered the "written materials, including the reports of the two other psychiatrists who had examined Ford at greater length," that the attorneys had submitted on Ford's behalf. *Ford*, 477 U. S. at 410 (III) (A), 412-413 (III) (C) (plurality portions of opinion). The *Ford* plurality concluded: "That this most cursory form of procedural review fails to achieve even the minimal degree of reliability required for the protection of any constitutional interest . . . is self-evident." Id. at 413 (III) (plurality portion of opinion). But none of these deficiencies identified by the *Ford* plurality are even *remotely* at issue regarding Georgia's procedure for evaluating intellectual disability claims.

Yet even though such glaring deficiencies did exist in *Ford*, the *Ford* plurality nevertheless articulated this measured prescription:

> We do not here suggest that only a full trial on the issue of sanity will suffice to protect the federal interests; we leave to the State the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences.

*Ford*, 477 U. S. at 416-417 (V) (A) (plurality portion of opinion). The plurality added this caution:

> [T]he lodestar of any effort to devise a procedure must be the overriding dual imperative of providing redress for those with substantial claims and of encouraging accuracy in the factfinding determination. The stakes are high, and the "evidence" will always be imprecise.

Id. at 417 (V) (A) (plurality portion of opinion). But its focus in making this statement was on the availability of an "adversary presentation of relevant information," the "manner of selecting and using the experts," and the need for "neutral, sound, and professional judgments" by those experts. Id. ("Fidelity to these principles is the solemn obligation of a civilized society.").

The *Ford* plurality specifically disavowed requiring the *full* panoply of procedures typically associated with a trial. See *Ford*, 417 U. S. at 416 (V) (A) (plurality portion of opinion) ("We do not here suggest that only a full trial on the issue of sanity will suffice. . . ."). Nevertheless, Georgia law *does* provide a right to a full jury trial on the question of intellectual disability. Also critically

63

absent from the *Ford* plurality's discussion is any mention whatsoever of a standard of proof to be applied to claims of incompetence to be executed.[17]  And this omission in *Ford* of any reference to a required standard of proof is all the more conspicuous in light of the fact that it seems certain, given the facts recited in *Ford,* that the Florida Governor had been completely unrestricted in selecting a standard of proof in Ford's case and that the plurality was indeed unaware of what that selected standard of proof might

---

[17] In noting here the omission of any discussion in *Ford* of Florida's standard of proof for claims of incompetence to be executed, we acknowledge Young's argument regarding the inherent difficulties in assessing intellectual disability.  However, we note that the matter was addressed by the concurring Justices in *Ford* but was considered by them as an *additional* reason to largely leave choices regarding procedure to the states.  See *Ford*, 477 U. S. at 426 (III) (Powell, J., concurring in part and concurring in the judgment) ("Unlike issues of historical fact, the question of petitioner's sanity calls for a basically subjective judgment." (citing *Addington v. Texas*, 441 U. S. 418, 429-430 (III) (B) (99 SCt 1804, 60 LE2d 323) (1979))); *Hill*, 662 F3d at 1354 (III) (D) (noting that "Georgia has exercised [the] leeway" provided by *Ford* "by determining that the risk of error due to malingering or other factors is substantial and that there is a need for a robust burden of proof").  See also *Heller v. Doe*, 509 U. S. 312, 322 (III) (A) (113 SCt 2637, 125 LE2d 257) (1993) (acknowledging *Addington* but crediting Kentucky's assessment that the "'risk of error'" regarding a standard of proof for claims of intellectual disability was less than it would be for claims of mental illness).

have been.[18]

We are not called upon here to make a pronouncement on the wisdom of Georgia's burden of proof from a policy perspective, and to do so would be beyond this Court's constitutional power. Instead, we are called upon to apply the Georgia Constitution and the United States Constitution. In light of the general discussion of due process above, and especially in light of the clear delegation to the states by *Atkins*, by reference to *Ford*, of much of the responsibility for designing appropriate procedures, we hold that the standard of proof for intellectual disability claims presently chosen by Georgia's General Assembly is not unconstitutional.

26. Young argues that, as a matter of Georgia statutory law, he should have been permitted to enter a plea of "guilty but mentally

---

[18] We note here that *Ford*'s omission of any prescription for a particular standard of proof was presumably made with the awareness of the fact, highlighted by the dissent here in Young's case in arguing that Georgia law creates an "unacceptable risk," that some risk inheres under *any* standard of proof. See *Hill*, 662 F3d at 1354 (III) (E) ("A third critical flaw in Hill's argument is that a risk of error exists with any burden of proof."). See also id. at 1354 (III) (D) (noting that the Georgia General Assembly has "determin[ed] that the risk of error due to malingering and other factors is substantial and that there is a need for a robust burden of proof").

retarded" over the objection of the State and that the trial court should then have held a hearing to determine if it would accept the plea and sentence him to imprisonment for life. The relevant statute provides:

> A plea of guilty but mentally ill at the time of the crime or a plea of guilty but mentally retarded shall not be accepted until the defendant has undergone examination by a licensed psychologist or psychiatrist and the court has examined the psychological or psychiatric reports, held a hearing on the issue of the defendant's mental condition, and is satisfied that there is a factual basis that the defendant was mentally ill at the time of the offense or mentally retarded to which the plea is entered.

OCGA § 17-7-131 (b) (2) (prior to an amendment in 2017 adopting the term "intellectual disability"). However, we reaffirm the soundness of our reasoning in *Stripling*, in which we held: "While the trial court may allow for the entry of a plea of guilty but mentally retarded by the defendant, the case would still go forward absent the agreement of the State to a judgment on that plea without a trial." *Stripling*, 289 Ga. at 376 (3). The provision in the statute at issue is analogous to the requirement in the Uniform Superior Court Rules that a trial court must find a factual basis for a plea of *guilty*

66

before accepting it, although the factual basis addressed in the statute regarding intellectual disability appears designed to protect only the interests of justice rather than the interests of the defendant as well. See *State v. Evans*, 265 Ga. 332, 334 (2) (454 SE2d 468) (1995) ("The purpose of USCR 33.9 is to protect against someone pleading guilty when that person may know what he has done but may not know that those acts do not constitute the crime with which he is charged."). This provision does not undermine the State's entitlement "to have its full case adjudicated" where the defendant seeks a sentence pursuant to a plea but the State insists on seeking a greater sentence through a jury verdict. See *Stripling*, 289 Ga. at 376 (3).

27. Young also argues that trying the questions of guilt and intellectual disability together in the guilt/innocence phase violated his constitutional rights. He acknowledges that this Court has held otherwise. See *King*, 273 Ga. at 272 (27) (citing *Palmer v. State*, 271 Ga. 234, 237 (3) (517 SE2d 502) (1999)). See also *Livingston v. State*, 264 Ga. 402, 406 (3) (444 SE2d 748) (1994) ("While there may be

advantages to a criminal defendant in having a trial apart from the guilt-innocence phase on the issue of mental retardation, such a change must come from the General Assembly."). However, he argues that the creation by the United States Supreme Court of a federal constitutional right of intellectually disabled persons not to be executed, particularly considering recent decisions from that Court applying that right, dictates a different holding now by this Court.

(a) Much of Young's argument here focuses on his mischaracterization of a holding of the United States Supreme Court. That Court held that whether a defendant could formulate plans to commit his or her crimes or could conceal facts or lie relative to his or her crimes should not be *determinative* of the question of intellectual disability, but the Court did *not* hold that evidence of such things was *irrelevant* to the question of whether a defendant is intellectually disabled under professionally accepted standards. See *Moore v. Texas*, __ U. S. __, __ (III) (139 SCt 666, 671-672, 203 LE2d 1) (2019) (stating that clinicians might find this type of evidence

68

relevant and citing American Association on Intellectual and Developmental Disabilities, Intellectual Disability:  Definition, Classification, and Systems of Supports 44 (11th ed. 2010).

Young also cites a psychological manual for the proposition that there is insufficient "normative information" about crimes in general to extrapolate conclusions regarding a defendant's intellectual disability from the manner in which the defendant has carried out his or her crime.  However, as with his characterization of Supreme Court case law, Young concludes too much here. Instead, we conclude that evidence regarding a defendant's actions during and around the time of a crime, although generally not *conclusive* on the question, can be *probative* regarding whether a defendant has deficits in specific adaptive behavior areas, just as his or her previously observed actions in *non*-criminal settings might similarly be probative on the question.  See id.; *Morrison v. State*, 276 Ga. 829, 831 (2) (583 SE2d 873) (2003).  Furthermore, we reach this conclusion despite the fact that intellectual disability must have an onset prior to the age of 18, because, as Young himself argues,

intellectual disability is regarded by mental health professionals as generally being a lifelong condition.

(b) We also are not persuaded by Young's argument that trying the questions of guilt and intellectual disability together prevented him from being able to "embrace" evidence of his crimes that arguably *supported* a finding of intellectual disability without thereby undermining his defense as to his guilt. This argument is somewhat surprising in light of Young's arguments regarding the alleged irrelevance of evidence regarding the crimes to a possible finding that he lacked deficits in adaptive behaviors. In any case, we conclude that defendants are not generally denied a fair opportunity to present a defense regarding their alleged guilt by having to address the evidence of that guilt alongside other evidence that might be relevant to a finding of intellectual disability, and we conclude as to Young specifically that he has failed to show that he suffered any actual disability in presenting such a defense.

(c) Young argues that trying the questions of guilt and intellectual disability together also wrongly suggested to the jury

70

that a finding of intellectual disability would result in inadequate punishment for the murder. As we discuss below in Division 34, the trial court properly charged the jury in a manner that made clear that, upon a finding of intellectual disability, Young would nevertheless be placed in the custody of the Department of Corrections. Accordingly, we conclude that this argument is unpersuasive.

(d) Young also argues that trying the questions of guilt and intellectual disability together deprived him of his ability to admit his guilt, "contrary to his desire and explicit request to accept the allegations of guilt." However, as we make clear below in Division 29, it is untrue as a matter of fact that Young ever sought to plead guilty to his charges other than as part of a plea bargain as to sentencing, which, as we explained above in Division 26, the trial court was not empowered to accept over the State's objection.

(e) In light of the foregoing discussion, and taking note of our discussion above in Division 25 regarding what procedural requirements are constitutionally required for intellectual disability

71

claims, we conclude that the General Assembly's chosen procedure of trying intellectual disability claims together with the issue of guilt is not unconstitutional. See *Atkins*, 536 U. S. at 317 (III) ("As was our approach in *Ford v. Wainwright*, with regard to insanity, 'we leave to the States the task of developing appropriate ways to enforce the constitutional restriction upon its execution of sentences.'" (quoting *Ford*, 477 U. S. at 416 (V) (A) (plurality portion of opinion))). Accordingly, we reaffirm this Court's prior case law on this issue. See *King*, 273 Ga. at 272 (27).

28. Young argues that his constitutional rights were denied by his being forced to speak to an expert witness designated by the trial court as a precondition to presenting his own expert testimony in support of his claim of intellectual disability. As discussed in detail below, we conclude that the trial court had discretion in this matter, but we further conclude that, because this claim was waived, we need not determine whether that discretion was abused.

(a) The circumstances concerning this claim began on June 2, 2011, when Young filed a notice regarding his intent to raise a

mental health defense at trial. The notice stated: "[T]he defense intends to raise the issue that the defendant or accused was insane, mentally ill or mentally retarded at the time of the act or acts charged against the accused."

On June 29, 2011, in response to this notice, the trial court ordered an evaluation of Young regarding his competence to stand trial and regarding his criminal responsibility as it related to the "mental capacity to distinguish right from wrong" and any possible "presence of a delusional compulsion." On January 17, 2012, the trial court conducted a hearing regarding the matter, and defense counsel explained that Young had refused to speak to the expert during the court-ordered evaluation, explaining that defense counsel intended to argue at trial only intellectual disability and not any other mental health claim and asserting that the facts of the crimes were irrelevant to the question of intellectual disability. The State countered that "the methods and manners and questions and evaluations that are used" to evaluate possible intellectual disability should be determined by the expert, that such an evaluation might

need to include the circumstances of the crimes, that the trial court had asked the expert to evaluate the general question of criminal responsibility, and that any diagnosis of intellectual disability would likely require the expert to consider and rule out other diagnoses. The trial court indicated that it would issue another order for an evaluation "for purposes of criminal responsibility and competency to stand trial, with retardation as being the primary focus of that evaluation." The trial court then indicated its initial opinion that any refusal of Young to answer questions put to him by the expert would prevent his use of his own expert at trial, but it left the matter somewhat in flux by stating: "So if we run up on that again, I'll be prepared to rule on it. We'll have to just hear what is and is not being answered by the defendant." Young then asserted that the statute governing intellectual disability claims was unconstitutional. The trial court instructed defense counsel to notify it if they had any concerns once the court issued its new written order for an evaluation, and the court indicated that, if there were concerns, it would conduct a hearing and "cross that bridge

when we get there."

On January 17 and 23, 2012, Young filed motions claiming that OCGA § 17-7-131 and Uniform Superior Court Rule 31.5 were unconstitutional to the extent that they might require him to speak to a mental health expert regarding the facts of the crimes. On January 24, 2012, the trial court conducted another hearing on this matter. The trial court maintained at the hearing that intellectual disability was a continuing mental condition despite the fact that its onset must be before the age of 18 for it to be given as a diagnosis, that evidence of that condition throughout all of one's life was relevant to the question of whether one is intellectually disabled, and that the facts of the crime therefore were also relevant to that question. The trial court then issued an order for Young to be evaluated by a mental health expert regarding his criminal responsibility and his competence to stand trial.[19] On January 26

---

[19] With regard to this second order, which was issued after Young had committed to the trial court that he would claim at trial only intellectual disability and not insanity or incompetence, we query whether the order should have omitted any reference to criminal responsibility and competence. While

and 30, 2012, the trial court filed written orders denying Young's motions challenging OCGA § 17-7-131 and Uniform Superior Court Rule 31.5. On January 30, 2012, Young filed a notice indicating that he was withdrawing his previous notice of an intent to present "testimony of an evaluating expert" at trial.

(b) As the trial court correctly noted, and as we noted above in Division 27 (a), this Court has held that

> evidence of a defendant's crimes in a mental retardation trial may be admissible as probative evidence of the defendant's intelligence if that evidence demonstrates his mental ability and adaptive skills, or is otherwise relevant to the question of whether he is mentally retarded.

*Morrison*, 276 Ga. at 831 (2). Cf. *Moore*, 139 SCt at 671-672 (III) (stating that clinicians might find this type of evidence relevant). We note, however, that in *Morrison* we relied on *Zant v. Foster*, in which this Court held that, in determining the proper role of evidence of a crime in a jury's consideration of a claim of intellectual

---

we need not address this concern at length here, we recommend a reexamination of Uniform Superior Court Rule 31.5 and the model order provided in it, upon which the trial court's order appears to have been based.

disability, a trial court must exercise its discretion in weighing the probative value of such evidence against "unfair prejudice." *Zant v. Foster*, 261 Ga. 450, 451-452 (4) (406 SE2d 74) (1991), overruled on other grounds by *State v. Patillo*, 262 Ga. 259, 261 n.1 (417 SE2d 139) (1992).

This Court has also held that a death penalty defendant who wishes to support his or her claims at trial through expert mental health testimony must submit to an examination by a mental health expert selected by the State because of "'the State's overwhelming difficulty in responding to the defense psychiatric testimony without its own psychiatric examination of the accused.'" *Jenkins v. State*, 265 Ga. 539, 540-541 (3) (458 SE2d 477) (1995) (quoting *Lynd v. State*, 262 Ga. 58, 64 (11) (414 SE2d 5) (1992) (citation and punctuation omitted)). See also *Nance v. State*, 272 Ga. 217, 219-220 (2) (526 SE2d 560) (2000) (citing *Buchanan v. Kentucky*, 483 U. S. 402, 422 (III) (A) (107 SCt 2906, 97 LEd2d 336) (1987), and *Estelle v. Smith*, 451 U. S. 454, 465 (II) (A) (2) (101 SCt 1866, 68 LE2d 359) (1981), and holding that, "when a defendant must submit to a court-

ordered mental health examination because he wishes to present expert mental health testimony at his trial, the State expert may only testify in rebuttal to the testimony of the defense expert or to rebut the testimony of the defendant himself"). However, this Court has also stated:

> In formulating the rule that a defendant in a case in which the State is seeking the death penalty must either cooperate in an evaluation by a mental health expert whose report will be given to the State or forfeit the right to present expert mental health testimony at trial, we have balanced the truth-seeking function of the courts, the defendant's constitutionally-protected privilege against self-incrimination, and the State's interest in having the ability to respond to the defendant's expert mental health testimony with [its own] expert testimony. . . .
> We have taken pains to ensure that the extent to which a defendant must waive his constitutionally-protected right to remain silent is no greater than is necessary to serve the purpose mandating the waiver: "to permit the State to formulate a response or a rebuttal to the testimony of the defendant's mental health expert."

*State v. Johnson*, 276 Ga. 78, 79 (2) (576 SE2d 831) (2003) (quoting *Nance*, 272 Ga. at 219-220 (2)).

In view of these prior holdings, we caution that a trial court must exercise discretion in responding to a defense objection

78

regarding the scope of questions to be asked in a court-ordered mental health evaluation of alleged intellectual disability or in responding to an objection to the scope of expert testimony based on such an evaluation. We stress that an inquiry regarding the facts of a defendant's alleged crimes is not necessarily irrelevant in such an evaluation by the State's expert or the Court's expert simply because the defense and its own expert might think so. However, we also note that the facts of the crime that would be relevant to alleged intellectual disability often can be made known to a mental health expert through sources other than the defendant's own statements and that a defendant often can be asked questions by an expert regarding the defendant's personal abilities as they relate to the facts of the crimes without asking the defendant whether he or she admits committing those crimes.[20]   Nevertheless, we need not

---

[20] For example, the State argues that Young's use of a GPS device to navigate to the crime scene is evidence undermining his claim of intellectual disability; however, we see no reason why Young could not have been asked by the State's expert generally about his ability to use a GPS device without being asked to make a direct admission of guilt.

consider whether the trial court properly exercised such discretion in Young's case, because, as we discuss below, we conclude that the issue was waived.

(c) On February 6, 2012, as jury selection was about to begin, the District Attorney stated:

> [T]he state will agree not to use any of the statements that the defendant makes pertaining to what happened at the time of the crime in terms of proving his guilt or innocence, despite the fact that that handcuffs the state in using that evidence to prove whether or not he's mentally retarded, we will put the defendant in a position now where the state will agree not to introduce any of that testimony and then let them still make the strategic choice that they want to make in terms of an expert.

The District Attorney further agreed that the trial court could order its designated expert, who had already conducted an evaluation without the benefit of any statements from Young about the crimes and who had already submitted a report under seal, "not to ask any questions about what Mr. Young did at the time of the offense."[21]

---

[21] We note from our own review of the record that the expert's sealed report indicated that Young had refused to speak about the crimes at the direction of his counsel, but we note that the expert was nevertheless able to conduct psychological tests and to render an opinion, which was that Young was not intellectually disabled.

Young rejected the State's offer based solely on the fact that it would "prejudice[] the defense in [its] strategic decision making" to accept the offer at that stage of the case; however, we note that Young made no complaint regarding the availability of his own expert to testify and made no motion for a continuance. The State argued persuasively in response that Young's true motivation was the fact that his own expert had tested his IQ as being 77, a fact that would have been difficult to explain at trial. See *Hall*, 572 U. S. at 722 (III) (D) (stating that "an individual with an IQ test score 'between 70 and 75 or lower' may show intellectual disability by presenting additional evidence regarding difficulties in adaptive functioning" (quoting *Atkins,* 536 U. S. at 309 n.5)); *Raulerson*, 928 F3d at 1008 (III) (C) (noting that "the Flynn effect adjusts for the empirical observation that IQ scores are rising over time" but that "there is no consensus about the Flynn effect among experts or among the courts"). In any case, the trial court implicitly accepted the State's offer and explicitly noted Young's rejection of that offer by stating: "All right. We will note, of course, the state's position as stated on

the record. . . . [A]nd I will note the decision of the defense as to how the mental retardation defense is to be asserted." Accordingly, we conclude that Young's claim here has been waived for the purposes of ordinary appellate review. See *Martin*, 298 Ga. at 278-279 (6) (d).

29. Young argues that he was forced to plead not guilty as a condition of seeking a verdict of guilty but mentally retarded and that such a requirement was unconstitutional and "prejudiced [him] by creating a false impression for the jury, judicially-sanctioned, that he did not accept responsibility and therefore felt no remorse." To the extent that Young is arguing that he was forced to plead not guilty as a precondition of seeking a decision by *a jury* of whether he was intellectually disabled, his claim is not supported factually by the record.

To support such a claim, Young relies on the transcript of a pretrial hearing held on whether he was required to speak to the State's expert about the facts of the crime as a precondition to presenting his own expert testimony on his alleged intellectual

disability. However, a review of the full transcript reveals that Young was *not* willing to plead guilty as part of a jury trial. Defense counsel made comments indicating his hope that the jury would find Young guilty but mentally retarded, but those comments never communicated a desire to enter a non-negotiated guilty plea. Instead, defense counsel stated: "I mean, essentially we would be happy to do so [plead guilty] in exchange for a sentence that we could agree upon." We also note that Young never moved the trial court to allow him to change the not guilty plea that he had entered and signed on the indictment. Indeed, even now on appeal, Young admits that his goal at this hearing was not to enter a guilty plea in advance of a jury trial, as he states: "In this case, defense counsel urged the court to allow Young to enter a plea of Guilty But Mentally Retarded in exchange for an agreed upon sentence." Accordingly, we conclude that Young never actually requested that he be allowed to enter a non-negotiated plea of guilty, with or without an associated claim of intellectual disability.

30.    Young argues that the trial court erred by excluding testimony from three witnesses on the subject of his alleged intellectual disability.  We see no error.

(a)    During defense counsel's direct examination of a social worker from Young's high school who had known Young and his family since Young was a young child, defense counsel asked the witness whether and how he had "ever come into the[] lives" of Young's brothers and sisters.  The State objected that the testimony sought was not relevant, and a bench conference was held and then explained later in detail on the record by the trial court and the parties.    Defense counsel explained that he had been seeking testimony showing that Young's siblings had been in special education.  Defense counsel conceded that it was "not universally accepted" in the mental health profession that there was a genetic component to intellectual disability, and it was not disputed that the witness was not qualified to testify on the matter as an expert; however, defense counsel argued that, "in the general community, people are aware that certain diseases such as mental retardation,

such as all different kinds of diseases, are genetic in nature." Nevertheless, defense counsel also stated immediately after the trial court announced its ruling: "I am certainly not making any assertion that anyone in Mr. Young's family is mentally retarded." Under these circumstances, we see no abuse of discretion in the trial court's sustaining the State's objection. See *Watson v. State*, 278 Ga. 763, 771 (10) (604 SE2d 804) (2004) (holding that the question of relevance is entrusted to a trial court's discretion and holding: "The proffered evidence in this case was too threadbare to be admissible."); cf. *Wilson v. State*, 233 Ga. 479, 481 (3) (211 SE2d 757) (1975) (holding that it was not improper for a non-expert to testify to a relevant factual matter within his personal knowledge).

(b) Pretermitting Young's likely waiver of the issue, we conclude that the trial court did not abuse its discretion by refusing to allow one of Young's former high school coaches to provide speculative testimony about what Young's team members thought of him or about whether the team members wished that they could be present at Young's trial. Instead, the trial court properly focused

the witness's attention on his personal observations regarding Young's interactions with his teammates. Cf. *Mathis v. State*, 291 Ga. 268, 270 (2) (728 SE2d 661) (2010) (addressing improper testimony that "was based not on [the witness's] personal knowledge but rather on hearsay").

(c) Another of Young's former high school coaches testified that Norfolk State College had regularly given "the opportunity to potential athletes to be admitted on a probationary status," that Young had "only lasted a short while" at the college, that "the idea wasn't so much for [Young] to be a four-year college graduate" but instead "was to hopefully improve his situation and to get him out of dodge," that "Norfolk State was giving him an opportunity to try to make it in school, to try to better himself," but that "[f]ootball was the whole idea." However, when the witness began to explain in more detail about what happened regarding the college when "they br[ought] you in," the State objected to "any sort of speculation about this" but conceded that the witness "c[ould] testify to personal knowledge about this situation." Defense counsel replied, "Sure."

86

The trial court then stated that it was sustaining the objection and directed defense counsel to "focus in a little more." The witness then testified: "[Young] got in because we had a contact there who recognized his football ability." The State objected, stating that a foundation should be shown for any personal knowledge of the witness on the subject, and the trial court instructed defense counsel to "go a little more foundational with that" and to "[a]llow the witness to explain his knowledge and how he gained it and so forth." Defense counsel again replied, "Sure." Pretermitting the possible waiver of the issue by Young, we conclude that the trial court did not abuse its discretion in the manner in which it handled the State's objections regarding this witness. Cf. *Mathis*, 291 Ga. at 270 (2).

31. Young argues that the State presented testimony from three of his co-workers at a food-canning company that the State knew from Young's employment records to be false. See *Napue v. Illinois*, 360 U. S. 264, 269 (79 SCt 1173, 3 LE2d 1217) (1959). These co-workers testified at trial in the State's rebuttal case in the

87

guilt/innocence phase, where Young's alleged intellectual disability was to be decided, that Young was "good at his job," was one of the "best operators" of the can-labeling equipment, was not "a problem employee," was "there every day, pretty much," "seemed to do fine," "was at work on time and everything," and was "always on time." From the 184 pages of Young's employment records spanning ten years, Young's brief points to "three suspensions, one lasting an entire week, twenty-nine unexcused absences, twenty-seven violations for lateness, and two warnings," to a notice of "poor job performance because of inattention, neglect or other non-deliberate actions," and to a notice regarding Young's third work suspension indicating that he would be terminated if he had an additional infraction.

In his response brief, the Attorney General notes that this "averages out to roughly a little less than three unexcused absences and three violations for lateness per year." Attempting to emphasize the gravity of the negative notations in his work records, Young cites the vague trial testimony of one of his co-workers that, "if you

accumulate up to, like, eight points, you get your terminated [sic] from the job." But the jury was aware at trial that Young was never terminated, and even now Young cites part of his work records showing that eight points only warranted a suspension. We also note that one of the co-workers testified that the point system "had nothing to do with the labeling part of it," which is borne out in the records and suggests that there is no reason to doubt the co-workers' testimony regarding Young's ability to perform his assigned work. Upon reviewing the co-workers' trial testimony and the ten years of work records submitted by Young on motion for new trial, the trial court found: "The defendant's personnel records do not establish as fact that the testimony of the defendant's coworkers and supervisors was knowingly and willfully false. . . ." We agree, and, therefore, Young's claim here fails.

32. Young argues that the State made improper arguments regarding his alleged intellectual disability. First, we hold that this claim has been waived for the purposes of ordinary appellate review, because Young did not raise any related objections at trial. See

*Martin*, 298 Ga. at 278-279 (6) (d).  Second, as we discuss below, the contested arguments were not improper.

(a)  Young contends that the State's argument placed "undue emphasis on Young's perceived adaptive strengths, arguing that relative strengths could overcome adaptive deficits," and that the State's argument improperly relied on lay stereotypes.  We disagree.

We note that it was the psychiatrist presented by the State[22] who set forth the areas of adaptive skills "listed in the DSM-IV-TR," an authoritative text in the field of mental health, and who, using a demonstrative exhibit without any objection from Young, explained the areas of adaptive skills "utilized by the American Academy of Mental Retardation."[23]  On cross-examination by Young, the State's psychiatrist also explained the three areas of adaptive skills used by

_____

[22] The State's psychiatrist, unlike the expert designated pretrial by the trial court whose report remained under seal, testified that he had never examined Young and had not reached a diagnosis regarding Young's alleged intellectual disability.

[23] Young assails the appropriateness of the diagnostic questions listed on this demonstrative exhibit.  However, the State's psychiatrist explained that these questions were "some suggest[ed] questions that they have for looking at those particular skills area[s]."

90

the American Association on Intellectual and Developmental Disabilities and the fact that a person would only need to have a deficit in *one* of those three areas to qualify for a diagnosis of mental retardation.

Notably, as the State did later in its closing argument, Young attempted in his cross-examination of the State's psychiatrist to emphasize specific things regarding Young's past behaviors and activities and how they might be relevant to the areas of adaptive skills. Even more notably, the State's psychiatrist answered affirmatively when Young asked whether "the DSM says that the focus is on the deficits," when Young asked whether, "if someone had particular strengths in any of these [areas of adaptive skills], they could still be classified as mentally retarded," when Young asked if it would be "irresponsible" to "ever say that[,] because [a person] can do X, one thing, that they are not mentally retarded," and when Young asked whether "what you're looking for is significant deficits in at least two" of the areas of adaptive skills when considering the list used by the AAMR. The State's psychiatrist also described how

91

intellectually disabled persons often "try to act normal" and engage in "parroting behavior," that some of them are able to interact appropriately, that "they may not look mentally retarded on the surface," that they may appear "street smart," and that they may be able to do some tasks normally. See *Moore*, 139 SCt at 669 (I) (citing *Moore*, 137 SCt at 1051-1052 (IV) (C) (1)) (holding that the procedure for considering alleged intellectual disability must be based on the medical community's diagnostic standards).

Having itself presented an expert who carefully explained the proper analysis of areas of adaptive skills under prevailing professional standards, the State gave a closing argument that attempted to highlight various parts of the evidence showing Young's lack of deficits in those areas. Upon our review of the State's arguments at issue, we conclude that, although at times somewhat impassioned, they were not improper. See *Cullen v. Pinholster*, 563 U. S. 170, 200 (III) (D) (1) n.19 (131 SCt 1388, 179 LE2d 557) (2011) (noting that the prosecuting attorney cannot be expected to argue the evidence in the light most favorable to the defendant); *Ellington*,

292 Ga. at 143 (9) (c) (noting the latitude granted to the parties in making their closing arguments), disapproved on other grounds by *Willis*, 304 Ga. at 706 (11) (a) n.3.

(b) As we explained in Division 27 (a), evidence regarding a defendant's actions during and around the time of a crime can be probative on the question of whether a defendant lacks deficits in specific areas of adaptive behavior. See *Morrison*, 276 Ga. at 831 (2). See also *Moore*, 139 SCt at 671-672 (III) (stating that clinicians might find this type of evidence relevant). Accordingly, we hold that the State did not act improperly by making arguments regarding Young's alleged intellectual disability based on the evidence of how he carried out his crimes.

(c) The State did not argue improperly by emphasizing the fact that there were no records showing any specific IQ score for Young, that the range of scores presumed by the school employees who testified on Young's behalf did not necessarily indicate intellectual disability, and that any additional IQ test that might be given to Young would "probably" show that, while not one of "the brightest

93

bulbs on the tree," Young was not intellectually disabled. See *Ellington*, 292 Ga. at 143 (9) (c) (noting the latitude granted to the parties in making their closing arguments).

33. Young argues that a particular juror tainted the jury with extrajudicial evidence and that the jury engaged in premature deliberations. As explained below, we reject both arguments.

Young questioned the juror during voir dire about his stepdaughter, and the juror disclosed that his stepdaughter had "special needs," that she was 19 years old but at times was like a 7 or 8 year old, that he had been her caretaker for 18 years, that her need for special education became apparent at the age of 3 or 4 years old, that she had been slow to learn to speak, that her disability was not apparent from her physical appearance, and that she had been diagnosed as brain damaged. Young did not move to have the juror excused for cause.

In support of this claim, which Young also raised in his motion for new trial, he relies on the testimony of an alternate juror. See *Collins v. State*, 308 Ga. 608, 610 (2) (842 SE2d 811) (2020) (noting

that juror testimony is permitted regarding extraneous prejudicial information).  But see *United States v. Siegelman*, 467 FSupp.2d 1253, 1279 (M.D. Ala. 2006) (expressing doubt that juror testimony regarding alleged premature deliberations is admissible).  The alternate juror testified that the juror in question entered the jury room after some testimony about intellectual disability, that he appeared to be "agitated," and that he stated to several other jurors that "he knew what a disabled person was because his [step]daughter was disabled and she had to have a lot of care."  The alternate juror testified that the juror in question "didn't actually come out and say" that Young was not disabled, but she testified that "it was basically like he could tell the difference between someone that had a disability and one that didn't," and she concluded, "I don't think he felt like [Young] had one."  The alternate juror testified that the juror in question was in the same corner of the jury room and with the same few other jurors that he had been with during other breaks, but she added that the juror was not loud, that the other jurors did not gather around him, and that she never

heard jurors, including those who were with the juror in question, deliberating or expressing an opinion about whether or not Young was intellectually disabled. In its order on Young's motion for new trial, the trial court found that the juror in question "was making statements concerning his life experience that apparently touched on the testimony he had just heard," that doing so was "understandable in light of his experience with his step daughter as revealed to counsel in voir dire," and that "[h]e expressed no opinion on any trial issues such as guilt or innocence or the mental condition of the defendant." The trial court further found that "these issues were not discussed, talked about, or deliberated" and concluded that the matter did "not constitute premature deliberation." The trial court also concluded that the statements to several jurors by the juror in question "d[id] not constitute extra judicial evidence."

(a) In light of the foregoing, we accept the trial court's findings of fact and agree with the trial court's conclusion that no premature deliberations occurred. See *Sims v. State,* 266 Ga. 417, 419-420 (3) (467 SE2d 574) (1996).

(b)  We also agree with the trial court's conclusion that the statements by the juror in question, which regarded matters that were discussed at length by him in his voir dire, did not warrant a new trial.  See *Martin*, 298 Ga. at 292-294 (16) ("Having accepted Juror Lemmond as a juror, Martin cannot now complain that her knowledge drawn from her past employment assisted the other jurors in considering the evidence and arguments made by the parties at trial."), disapproved on other grounds by *Willis,* 304 Ga. at 706 (11) (a) n.3.

34.  The trial court charged the jury, in accordance with OCGA § 17-7-131 (b) (3) (C), that a verdict of guilty but mentally retarded would result in Young's being "placed in the custody of the Department of Corrections," which would monitor his "mental health needs," and that, "at the discretion of the Department of Corrections," he could be "referr[ed] for temporary hospitalization at a facility operated by the Department of Behavioral Health and Developmental Disabilities."  The trial court correctly refused to include Young's requested additional charge that, upon such a

verdict, "the defendant w[ould] be sentenced to imprisonment for life." The charge as given was not misleading, because it clearly stated that the DOC would have custody of Young. Furthermore, this Court has held that charges prior to a guilty verdict generally should not give any instruction regarding possible sentences. See *Patillo*, 262 Ga. at 260. Although the charge prescribed by the Code and given in Young's case is a limited exception to this general rule that is designed to prevent jurors from speculating about a defendant's "immediate release" upon a finding of mental retardation, the additional charge requested by Young about a life sentence would have simply drawn undue attention to the issue of sentencing and would have raised questions such as whether or not a life sentence would carry the possibility of parole.

35. Young argues that the trial court erred by denying five requests to charge on the subject of intellectual disability, and he highlights in particular his requested charges that the jury could find Young intellectually disabled even if it found adequate functioning in some or many areas of adaptive functioning, that

"[i]ndividuals may have capabilities and strengths that are independent of their mental retardation," and that such "abilities do not exclude a diagnosis of mental retardation." The trial court correctly instructed the jury on the statutory definition of "mental retardation," charging as follows: "The term mentally retarded means having significantly subaverage general intellectual functioning resulting in or associated with impairments in adaptive behavior that became clear during the developmental period." See OCGA § 17-7-131 (a) (3) (prior to an amendment in 2017 adopting the term "intellectual disability" and renumbering subdivisions); OCGA § 17-7-131 (a) (2) (after the amendment in 2017). We agree with the trial court that the additional, detailed charges requested by Young, which were drawn from two professional texts and a federal district court opinion, were not incorrect statements but nevertheless were more matters of evidence rather than legal principles suitable for jury charges.[24] Accordingly, we conclude that

_____

[24] We note that, through questioning both by the State on direct examination and by Young on cross-examination, the State's psychiatrist

99

the trial court did not err in refusing to give them. See *Massey v. State*, 270 Ga. 76, 78 (4) (c) (508 SE2d 149) (1998) ("It is axiomatic that a trial court does not err in refusing to give a requested instruction in the exact language requested where the charges given in their totality substantially and adequately cover the principles contained in the requested charge.").

36. Young made no objection to the trial court's charging the jury, according to OCGA § 16-2-3, that "[e]very person is presumed to be of sound mind." Therefore, his claim on appeal that the charge should not have been given is subject to review only for whether there was plain error that affected substantial rights and under our Sentence Review below regarding Young's death sentence. See OCGA § 17-8-58 (b); *Martin*, 298 Ga. at 278-279 (6) (d). Nevertheless, we conclude that the trial court did not err under even the ordinary standard of review, because the charge was entirely consistent with the fact that, under Georgia law as we affirm it

testified about the same diagnostic principles that Young asked the trial court to address in the jury charges.

100

above, Young bore the burden of proving his alleged intellectual disability. See *Medina*, 505 U. S. at 452 (II) ("In light of our determination that the allocation of the burden of proof to the defendant does not offend due process, it is not difficult to dispose of petitioner's challenge to the presumption of competence imposed [under California law].").

37. Young argues that the pre-printed verdict form used in the guilt/innocence phase of his trial, coupled with the trial court's charges to the jury, would have misled the jury regarding its duties in considering his alleged intellectual disability. See *Rowland v. State*, 306 Ga. 59, 67-68 (6) (829 SE2d 81) (2019) (holding that a verdict form should be considered in conjunction with the jury charges); *Rucker v. State*, 270 Ga. 431, 435 (5) (510 SE2d 816) (1999) (holding that the use of a verdict form is error if it "would mislead jurors of reasonable understanding"). In Young's case, the verdict form and the jury charges made clear that the jury was to select, for each of the charges in the indictment, only one of the three verdict options: not guilty, guilty, or guilty but mentally retarded. The

charges, read as a whole, also made clear that *no* verdict could be reached and entered on the verdict form unless it was unanimous. Furthermore, despite the trial court's somewhat confusing statement at one point that the jury should determine which of the three verdicts applied if it found that Young was "suffering mental retardation," the charges as a whole indicated that the jury should reach a unanimous conclusion regarding one option to the exclusion of the other two.

Finally, after first stating that the jury would have the "duty" to find Young guilty but mentally retarded if it so found beyond a reasonable doubt, the charges, in tracking the language of the pattern jury charge, later stated as to each charge that the jury would be "authorized" to enter such a verdict upon such a finding. See Suggested Pattern Jury Instructions, Vol. II: Criminal Cases, § 3.80.50.[25]  However, in light of the clear charges to the jury that any verdict must be unanimous and in light of a charge that individual

---

[25] In identifying no reversible error, we do not suggest that this pattern charge could not be improved.

jurors "should never surrender an honest opinion in order to be congenial or to reach a verdict," we conclude that the jury would not have been misled regarding its duties by the use of the word "authorized."[26]  Cf. *Cheddersingh v. State*, 290 Ga. 680, 681-682 (2) (724 SE2d 366) (2012) (holding that a preprinted verdict form and jury charges should be considered as a whole and concluding that the verdict form might have led the jury to believe that it must conclude beyond a reasonable doubt that the defendant was not guilty in order to acquit).

Young raised no objection to either the charges at issue or to the verdict form.  Therefore, the issues here are subject to review only for whether there was plain error that affected substantial rights and under our Sentence Review below regarding Young's death sentence.  See OCGA § 17-8-58 (b); *Martin*, 298 Ga. at 278-

---

[26] Young argues that the jury's notes to the trial court discussed in Division 45 show that it struggled with the issue of his alleged intellectual disability.  Contrary to this argument, even assuming that such a fact is relevant at all to evaluating the charges and verdict form, we conclude that this fact shows that the jurors did indeed follow the trial court's charge on not surrendering individual opinions simply to reach a verdict.

279 (6) (d). To show plain error, an appellant must show: (1) there was no affirmative waiver; (2) the error was obvious; (3) the instruction likely affected the outcome of the proceedings; and (4) the error seriously affects the fairness, integrity, or public reputation of the judicial proceedings. See *Beasley v. State*, 305 Ga. 231, 236 (3) (824 SE2d 311) (2019). In light of the discussion above, and pretermitting the questions of whether any error here was affirmatively waived or should have been obvious to the trial court, we conclude that the outcome in Young's case was not likely affected and that any error did not seriously affect the fairness, integrity, or public reputation of his proceedings.

### *Issues Related to the Sentencing Phase*

38. We see no merit to Young's arguments, including his arguments regarding the decline in the frequency of death sentences, that Georgia's death penalty statutes are unconstitutional in that they fail to sufficiently narrow the categories of murder eligible for the death penalty and thereby result in arbitrary and capricious death sentences. See *Ellington*,

292 Ga. at 116 (3) (b), disapproved on other grounds by *Willis,* 304 Ga. at 706 (11) (a) n.3.

39. Young argues that the trial court improperly closed the courthouse during the sentencing phase and thereby violated his constitutional rights. See *Waller v. Georgia,* 467 U. S. 39, 46 (II) (A) (104 SCt 2210, 81 LE2d 31) (1984) (discussing the right to a public trial). The day in question was a furlough day for county employees; however, the trial court informed the parties that it would be having court on the furlough day and that the courthouse would be open to members of the public who wished to attend. On the furlough day, the trial court noted on the record that bailiffs had been "instructed at the front door that if anyone comes in looking for the, for a closed office, to tell them, but the building is open to the public." Young did not object to holding the trial on the furlough day. Testimony from officers confirmed that an entrance was open and that no one was turned away. We conclude that this issue was waived for the purposes of ordinary appellate review by Young's failure to object in the trial court. See *Martin,* 298 Ga. at 278-279 (6) (d). Furthermore,

the record supports the trial court's finding that the courtroom remained open with access freely available to the public. Cf. *State v. Brown*, 293 Ga. 493, 493-496 (1) (748 SE2d 376) (2013) (addressing a courthouse that was accessible only to persons with a special relationship to court personnel).

40. Young argues that the trial court erred by overruling certain objections to the State's victim impact testimony. We have held previously that victim impact testimony should not include characterizations of the crime or the defendant and that it should not include any statements regarding the appropriate sentence. See *Bryant*, 288 Ga. at 895 (15) (a). We have held that testimony regarding the emotional impact on the victim's family and the community must be controlled within the trial court's discretion but is not categorically improper. See *Walker v. State,* 282 Ga. 774, 779-780 (11) (653 SE2d 439) (2007), disapproved on other grounds by *Ledford v. State*, 289 Ga. 70, 85 (14) (709 SE2d 239) (2011), disapproved on other grounds by *Willis*, 304 Ga. at 706 (11) (a) n.3. We have held that victim impact testimony should not encourage the

jury to base its sentencing decision on factors such as "class or wealth." *Livingston*, 264 Ga. at 404 (1) (b). We have held that "religious references" in victim impact testimony are not categorically prohibited but instead are entrusted to the trial court's discretion. *Pickren v. State*, 269 Ga. 453, 454-455 (1) (500 SE2d 566) (1998). We have also held that victim impact testimony may include evidence such as video recordings or photographs "of the victim alive." *Tollette v. State*, 280 Ga. 100, 105 (11) (621 SE2d 742) (2005). Finally, we have held that "even some legitimate victim impact evidence could inflame or unduly prejudice a jury if admitted in excess." *Livingston*, 264 Ga. at 404 (1) (b). Applying these various principles, and pretermitting the fact that Young waived much of this claim by failing to object or by failing to obtain rulings, we conclude that the specific portions of the victim impact testimony that Young complains about on appeal were not improper. See *Walker*, 282 Ga. at 779 (11).

41. Young argues that the trial court prevented him from asking certain witnesses in the sentencing phase about the impact

107

that Young's execution would have on them. We conclude that, by agreeing first to a general set of questions to be asked of witnesses and then agreeing to additional questions to be asked of close family members, Young waived this claim for the purposes of ordinary appellate review. See *Martin,* 298 Ga. at 278-279 (6) (d). Furthermore, we conclude that the trial court's approach to this matter was not an abuse of discretion, because the court accepted the fact that a witness with especially intimate knowledge of a defendant can sometimes shed light on the defendant's character by asking for mercy and by testifying about how the loss of the defendant would affect the witness personally and thus permitted some questions on the matter, while it also set reasonable limits on which witnesses were in a suitable position to give such testimony. See *Bryant,* 288 Ga. at 899 (16) (holding that "mitigating evidence that does not focus on the character, background, or offense of the particular defendant on trial is properly excluded"); *Barnes v. State*, 269 Ga. 345, 359 (27) (496 SE2d 674) (1998) ("In Georgia, mitigation evidence that relates to the individual defendant and not to the

108

death penalty in general is admissible."); *Childs v. State*, 257 Ga. 243, 256 (19) (b) (357 SE2d 48) (1987) (holding that, "although a defendant may present witnesses who know and care for him and are willing on that basis to ask for mercy on his behalf, a defendant may not present witnesses to testify merely to their religious or philosophical attitudes about the death penalty"); *Romine v. State*, 251 Ga. 208, 217 (11) (305 SE2d 93) (1983) ("Ralph's testimony that he did not wish to see his grandson die would have been admissible in mitigation. . . .").

42. Young argues that it was unconstitutional for his jury to consider alleged non-statutory aggravating circumstances without being instructed that such circumstances must be found beyond a reasonable doubt. First, this specific issue was not raised in the trial court and therefore has been waived for the purposes of ordinary appellate review. See *Martin*, 298 Ga. at 278-279 (6) (d). Furthermore, contrary to Young's argument, "the finding of a non-statutory aggravating circumstance does not increase the defendant's maximum potential punishment" and therefore does not

have to be found beyond a reasonable doubt. *Ellington*, 292 Ga. at 116-117 (3) (d) (citing *Ring v. Arizona*, 536 U. S. 584, 609 (II) (122 SCt 2428, 153 LE2d 556) (2002)), disapproved on other grounds by *Willis*, 304 Ga. at 706 (11) (a) n.3.

43. We reject Young's invitation to overrule our precedent holding that this Court's proportionality review under OCGA § 17-10-35 (c) (3) can never "'increase . . . the maximum punishment'" and therefore does not have to be performed by a jury under the beyond a reasonable doubt standard. *Willis*, 304 Ga. at 693 (3) (c) (citation omitted).

44. During sentencing phase deliberations, the jury sent the trial court a note asking if there is "an automatic appeal when the death penalty is given," and the trial court responded: "You are to decide this case based upon the evidence, the law and the instructions given to you. You are not to concern yourselves with matters of this nature." Young's complaint regarding this response was waived for the purposes of ordinary appellate review by Young's failure to object at trial. See *Martin*, 298 Ga. at 278-279 (6) (d).

110

Furthermore, we conclude that the trial court's response was not unconstitutional as Young argues, because it did not suggest that "the responsibility for determining the appropriateness of the defendant's death rest[ed] elsewhere." *Caldwell v. Mississippi*, 472 U. S. 320, 329 (III) (105 SCt 2633, 86 LE2d 231) (1985) (reversing where the prosecutor argued that any death sentence would be reviewed by the appellate court for correctness).

45. Young argues that the trial court erred regarding two other notes from the jury during its sentencing phase deliberations. As explained below, we see no error.

(a) About an hour and 45 minutes into sentencing phase deliberations, a juror sent a note to the trial court stating: "I am asking to be dismiss [sic] as a juror. I have lots of questions and due to those I cann't [sic] say yes to death penalty." The trial court did not abuse its discretion by refusing Young's request to declare a jury deadlock and impose a sentence of life without parole, as it was not clear at this early stage that additional deliberations would be fruitless. The trial court also did not abuse its discretion by refusing

111

Young's request "that the Court instruct the juror that each person's individual, moral assessment is to be respected." Instead, the trial court acted properly in simply letting the jury continue to deliberate under the court's original instructions, when there was no reason for the court to believe that the juror had misunderstood them, while announcing that it would take further action if the jury later notified the court of a deadlock. See *Porras v. State*, 295 Ga. 412, 419-420 (3) (761 SE2d 6) (2014) (holding that a trial court did not err by ordering the jury to continue deliberating). Cf. *Anderson v. State*, 262 Ga. 26, 27 (1) (c) (413 SE2d 732) (1992) ("The record in this case indicates that the jury was confused about the charge. No remedial instruction was given. . . .").

(b) Later, the jury sent a note informing the trial court that it was deadlocked eleven to one in favor of a death sentence and asking, "What is the next step?" At that point, which was after less than four hours of deliberations, the trial court properly charged the jury consistently with this Court's suggested modified *Allen* charge for such circumstances, instructing them (1) that each juror must

112

agree in order for the jury to return a verdict, (2) that jurors have a duty to consult one another, (3) that each juror must decide the case for himself or herself, (4) that a juror should not hesitate to reexamine his or her views and change an opinion if convinced that it is erroneous, and (5) that no juror should surrender his or her views solely based on other jurors' opinions or for the mere purpose of returning a verdict. See *Romine v. State*, 256 Ga. 521, 527 (1) (d) (350 SE2d 446) (1986). See also *Allen v. United States*, 164 U. S. 492 (17 SCt 154, 41 LE 528) (1896). We disagree with Young's contention that the charge given was coercive or improperly singled out the one juror who had not voted for death, even accounting for the fact that the jury had volunteered in its note the nature and breakdown of its deadlock. Cf. *Smith v. State*, 302 Ga. 717, 721 (2) (808 SE2d 661) (2017) (providing guidance on determining if an *Allen* charge was coercive).

46. We reject Young's argument that his right to be present was denied in the sentencing phase during bench conferences in which the juror notes regarding an alleged jury deadlock were

113

discussed. We conclude that the trial court did not err in its order denying Young's motion for new trial in concluding that he was aware of the subject matter of the bench conferences, that the decisions made at them were announced in open court, that Young never personally voiced any concerns, and, accordingly, that Young personally acquiesced in the waiver of his presence that was made by his counsel. Cf. *Champ*, 310 Ga. at 834-848 (2) (a, b, and c) (remanding where the trial court had not ruled on the defendant's acquiescence in counsel's waiver).

### *Appellate Issues*

47. Young argues that he is entitled to a new trial because a photograph of him as an infant or toddler was admitted at trial but is not included in the appellate record, despite the best efforts of his counsel on remand from this Court to complete the record, including a trip to New Jersey. First, Young has failed to show why he could not have obtained an adequate description of the photograph, with or without an intervening trip to New Jersey, in an order from the trial court pursuant to OCGA § 5-6-41 (f). Second, we conclude that

114

a photograph of Young as a very young child would not assist our appellate review. See *West v. State*, 306 Ga. 783, 787 (2) (833 SE2d 501) (2019); *Brockman v. State*, 292 Ga. 707, 716 (5) (b) (739 SE2d 332) (2013) (denying relief where the defendant failed to show that he was harmed or prevented from raising any viable issue on appeal by the omission from the record of four exhibits, including three mitigation photographs).

48. Young argues that his convictions and sentences should be reversed based on a cumulative error analysis. Pretermitting the question of how suitable the various issues are for such a review and what rule this Court should adopt in that regard in the future, we hold that the cumulative effect of the several instances of constitutional violations and trial court error that we have assumed to exist above does not warrant relief under any rule that we might adopt. See *State v. Lane*, 308 Ga. 10, 14 (1), 17-18 (1), 21-22 (4) (838 SE2d 808) (2020) (holding that "Georgia courts . . . should consider collectively the prejudicial effect of trial court errors and any deficient performance by counsel — at least where those errors by

the court and counsel involve evidentiary issues" but declining to decide "exactly how multiple standards may interact under cumulative review of different types of errors").[27]

*Sentence Review*

49. Upon our review of the entire record, especially those portions relevant to the matters noted above that were waived for the purposes of ordinary appellate review, we conclude that the sentence of death in this case was not imposed under the influence of passion, prejudice, or any other arbitrary factor. See OCGA § 17-10-35 (c) (1). See also *Martin*, 298 Ga. at 279 (6) (d) (stating regarding this Court's review under OCGA § 17-10-35 (c) (1): "That plenary review guards against any obvious impropriety at trial, whether objected to or not, that in reasonable probability led to the jury's decision to impose a death sentence.").

50. In its sentencing verdict, the jury found as statutory aggravating circumstances that the murder was committed while

---

[27] Our analysis here includes the issues addressed in Divisions 5, 16, and 37. However, we reiterate that we are not announcing here a rule regarding what types of error should be considered cumulatively.

Young was engaged in the commission of burglary and aggravated battery and that the murder was outrageously or wantonly vile, horrible, or inhuman in that it involved torture and aggravated battery to the victim before death and involved the defendant's depravity of mind. See OCGA § 17-10-30 (b) (2), (7). Upon our review of the record, we conclude that the evidence presented at trial was sufficient to authorize a rational trier of fact to find beyond a reasonable doubt the existence of these statutory aggravating circumstances. See *Ring*, 536 U. S. 584, passim; *Jackson*, 443 U. S. at 319 (III) (B); OCGA § 17-10-35 (c) (2) (requiring a review of the statutory aggravating circumstances found by the jury); UAP IV (B) (2) (providing that, in all death penalty cases, this Court will determine whether the verdicts are supported by the evidence).

51. The Georgia Code requires this Court, in the direct appeal of a death sentence, to determine "[w]hether the sentence of death is excessive or disproportionate to the penalty imposed in similar cases, considering both the crime and the defendant." OCGA § 17-10-35 (c) (3). As discussed below, we reject Young's arguments that

117

our proportionality review is unconstitutional or otherwise improper, we reject his claim that he is categorically exempt from a death sentence based on his claim of intellectual disability, and we conclude that his death sentence is not disproportionate punishment.

(a)    Contrary to Young's arguments, "[t]his Court's proportionality review is not inadequate under statutory or constitutional standards," *Ellington*, 292 Ga. at 117 (3) (e), disapproved on other grounds by *Willis*, 304 Ga. at 706 n.3, and there is no need for this Court to remand this case to the trial court for further proceedings regarding this issue.   In support of this holding, we set forth our reasoning regarding Young's specific arguments in more detail below.

(i)  As this Court has explained previously, our proportionality review

> concerns whether the death penalty 'is excessive per se' or if the death penalty is 'only rarely imposed . . . or substantially out of line' for the type of crime involved and not whether there *ever* have been sentences less than death imposed for similar crimes.

118

*Gissendaner*, 272 Ga. at 717 (19) (a) (citations omitted).

Furthermore, as noted previously in a concurrence to the affirmance

of the soundness of this Court's proportionality review:

> The Court does not determine whether the death sentence
> under review represents a large or small percentage of
> sentences in factually comparable cases. Rather, the
> Court examines the sentence on appeal to ensure that it
> is not an anomaly or aberration.

*Terrell v. State*, 276 Ga. 34, 46 (572 SE2d 595) (2002) (Fletcher, C.J.,

concurring). Thus, an argument like Young's highlighting the

infrequency of death sentences in Georgia, particularly regarding

cases involving crimes that are arguably somewhat similar to his

and defendants that are arguably somewhat similar to him, "while

not irrelevant, cannot alone compel a finding of unlawful

disproportionality." *Gissendaner*, 272 Ga. at 717 (19) (a). Instead,

"[t]his Court views a particular crime against the backdrop of all

similar cases in Georgia in determining if a given sentence is

*excessive per se or substantially out of line*." Id. (emphasis supplied).

We reaffirm these aspects of our proportionality review.

119

(ii) We reaffirm this Court's previous holding that, "[b]ecause it is a jury's reaction to the evidence before it that concerns this Court in its proportionality review, it is irrelevant if the sentences in the cases used for comparison were already at the time, or later are, reversed for reasons unrelated to the juries' reactions to the evidence." *Davis v. Turpin*, 273 Ga. 244, 246 (2) (539 SE2d 129) (2000).[28]

(iii) We disagree with Young's assertion that this Court's partial reliance in its proportionality review on some cases that are not as recent as others in itself renders this Court's proportionality review inadequate.

(iv) The Georgia Code provides that this Court

shall be authorized to employ an appropriate staff and such methods to compile such data as are deemed by the Chief Justice to be appropriate and relevant to the statutory questions concerning the validity of the

---

[28] Young cites one particular case that he claims this Court cited in its proportionality reviews in several other defendants' direct appeals but was later vacated on habeas review on grounds that arguably affect the question of proportionality regardless of the correctness of our reasoning in *Davis*; Young's point is unpersuasive, however, because his proportionality review is being conducted here on its own merits. We are also unpersuaded by Young's arguments that are based on a 2007 newspaper article that failed to comprehend or accept our reasoning in *Davis*.

sentence reviewed in accordance with Code Section 17-10-35.

OCGA § 17-10-37 (b) (as amended by Ga. L. 2010, p. 420, § 2). In a case where this Court affirms a death sentence, the role of the "compil[ation] of] such data," id., is reflected in this Court's published decision, including in an appendix providing "a reference to those similar cases which [this Court] took into consideration," OCGA § 17-10-35 (e). See also OCGA § 17-10-35 (e) (2) (directing this Court to provide the trial court, for resentencing purposes, with "[t]he records of those similar cases" cited by this Court in its opinion and with "the extracts prepared as provided for in subsection (a) of Code Section 17-10-37" in any case where this Court sets aside a death sentence on proportionality grounds). This Court's proportionality review complies with statutory requirements regarding its consideration of relevant data, and we hold that this Court's practices regarding those data are not unconstitutional. In light of this holding, we decline Young's invitation to remand this case for further evidentiary development regarding this issue,

121

including his request to probe this Court's internal deliberative processes via an Open Records Act request directed at this Court and via subpoenas directed to this Court's staff. Cf. UAP IV (B) (1) (providing for this Court to direct the trial court to conduct whatever further proceedings this Court deems necessary to allow a full review on appeal).

(v) Finally, Young complains that it is "unfair" that he will not have access to this Court's reasoning regarding the proportionality of his death sentence prior to the issuance of this opinion, after which his only remaining remedy in this Court will be a motion for reconsideration. In rejecting this argument, we note that a similar difficulty presents itself to all unsuccessful appellants in this Court, regardless of the issue decided on appeal.

(b) Young argues that he belongs to a class of persons, namely persons with intellectual disability, who are categorically exempt from the death penalty under the United States Constitution and the Georgia Constitution and that this Court should enforce that exemption through this Court's proportionality review in his case,

see OCGA § 17-10-35 (c) (3), or through other unspecified authority. Although we have previously held that the execution of an intellectually disabled person would violate the Georgia Constitution, see *Fleming*, 259 Ga. at 690 (3), we see no constitutional infirmity in the General Assembly's determination that the issue of whether a defendant is categorically exempt from the death penalty based on intellectual disability should be decided by a jury, rather than by this Court, subject only to this Court's review of the sufficiency of the evidence to support the jury's verdict. But cf. *Hill*, 269 Ga. at 303-304 (3 and 4) (holding that, where alleged intellectual disability was not determined by a jury at trial despite the statutory provision allowing for such a claim at that stage, a *habeas* court may consider alleged intellectual disability under the miscarriage of justice exception to the procedural default rule). Nevertheless, we do consider Young's evidence of alleged intellectual disability falling short of the categorical exemption here in our proportionality review, because we are directed by law to consider "the crime *and the defendant*." OCGA § 17-10-35 (c) (3).

(c) The evidence in this case shows that, after weeks of careful planning, Young ruthlessly executed the prolonged attack on and brutal murder of his former fiancée's son for the purpose of manipulating his former fiancée into resuming a relationship with him and returning to live with him. Considering both the crime and the defendant, including the evidence of his intellectual difficulties, we conclude that the death sentence imposed for the murder in this case is not disproportionate punishment within the meaning of Georgia law. See OCGA § 17-10-35 (c) (3); *Gissendaner*, 272 Ga. at 716-717 (19) (a) (holding that this Court's statutorily mandated proportionality review concerns whether a particular death sentence "is excessive per se" or is "substantially out of line"). The cases cited in the Appendix support our conclusion, because each shows a jury's willingness to impose a death sentence for the deliberate, unprovoked commission of a murder during the commission of a burglary, see OCGA § 17-10-30 (b) (2), or a murder that was "outrageously or wantonly vile, horrible, or inhuman," see OCGA § 17-10-30 (b) (7). See OCGA § 17-10-35 (e). See also *Barrett v. State*,

124

292 Ga. 160, 190 (4) (733 SE2d 304) (2012) (explaining that seldom, if ever, will the facts surrounding two death penalty cases be entirely alike and that this Court is not required to find identical cases for comparison in its proportionality review); *Ross v. State*, 233 Ga. 361, 366-367 (2) (211 SE2d 356) (1974) ("It is the reaction of the sentencer to the evidence before it which concerns this court and which defines the limits which sentencers in past cases have tolerated. . . .").

*Judgment affirmed. All the Justices concur, except Nahmias, P. J., and Boggs and Peterson, JJ., who concur specially, Warren, J., who concurs in judgment only, and Bethel, J., who dissents.*

## APPENDIX

*Spears v. State*, 296 Ga. 598 (769 SE2d 337) (2015), disapproved on other grounds by *Willis v. State*, 304 Ga. 686, 706 (11) (a) n.3 (820 SE2d 640) (2018); *Barrett v. State*, 292 Ga. 160 (733 SE2d 304) (2012); *Ledford v. State*, 289 Ga. 70 (709 SE2d 239) (2011), disapproved on other grounds by *Willis,* 304 Ga. at 706 (11) (a) n.3; *Arrington v. State*, 286 Ga. 335 (687 SE2d 438) (2009); *Walker v. State,* 282 Ga. 774 (653 SE2d 439) (2007) (relevant to Young's case despite the fact that the convictions and sentences were later vacated for reasons unrelated to the jury's reaction to the evidence before it, see *Humphrey v. Walker*, 294 Ga. 855 (757 SE2d 68) (2014), disapproved on other grounds by *Ledford,* 289 Ga. at 85 (14), disapproved on other grounds by *Willis,* 304 Ga. at 706 (11) (a) n.3)); *Lewis v. State,* 277 Ga. 534 (592 SE2d 405) (2004) (relevant to Young's case despite the fact that the death sentence was later vacated for reasons unrelated to the jury's reaction to the evidence

before it, see *Hall v. Lewis*, 286 Ga. 767, 767-768, 781 (II) (692 SE2d 580) (2010)); *Sallie v. State*, 276 Ga. 506 (578 SE2d 444) (2003); *Braley v. State*, 276 Ga. 47 (572 SE2d 583) (2002); *Terrell v. State*, 276 Ga. 34 (572 SE2d 595) (2002); *Fults v. State*, 274 Ga. 82 (548 SE2d 315) (2001); *McPherson v. State*, 274 Ga. 444 (553 SE2d 569) (2001) (relevant to Young's case despite the fact that the death sentence was later vacated for reasons unrelated to the jury's reaction to the evidence before it, see *Hall v. McPherson,* 284 Ga. 219, 220 (663 SE2d 659) (2008)); *King v. State*, 273 Ga. 258 (539 SE2d 783) (2000); *Jones v. State*, 273 Ga. 231 (539 SE2d 154) (2000), overruled on other grounds by *State v. Lane*, 308 Ga. 10, 23 (838 SE2d 808) (2020); *Drane v. State*, 271 Ga. 849 (523 SE2d 301) (1999), 265 Ga. 255 (455 SE2d 27) (1995); *Jones v. State*, 267 Ga. 592 (481 SE2d 821) (1997).

NAHMIAS, Presiding Justice, concurring specially.

With the one exception that I discuss below, I am fairly confident that the Court reaches the right result on all of the issues presented in this case, so I concur in the judgment upholding Young's convictions and sentences, including his death sentence. I am less sure about everything the plurality opinion says, or fails to say, about each of the issues presented. I do not fault the author of the plurality opinion for that, because the opinion has to try to explain its reasoning regarding the 50 enumerations of error (many with subparts) raised in Young's 466-page principal brief (which was supplemented by another 76 pages of argument in a reply brief), and the Court must decide this case (along with our many other second-term cases) by July 2 to comply with our state Constitution's unique "two-term rule." See Ga. Const. of 1983, Art. VI, Sec. IX, Par. II ("The Supreme Court and the Court of Appeals shall dispose of every case at the term for which it is entered on the court's docket for hearing or at the next term.").

This Court has not (yet) imposed a page limit on briefs in death penalty cases. See Supreme Court Rule 20 (3). Compare id. (1) and (2) (imposing a 50-page limit for principal briefs in other criminal cases and a 30-page limit in civil cases). Young presents several substantial issues, but it is difficult to identify the wheat among all the chaff, and even the chaff must be addressed. Indeed, the plurality opinion might be 250 pages long if it dealt with every issue in detail (and if this Court had time to do so). Because Young has chosen to present his appeal in this way, I join only the result of the plurality opinion, without necessarily agreeing with every bit of its analysis.

The issue that is closest, as evidenced by Justice Bethel's dissent, and as to which I have the least confidence in the result, is the continued viability, under the Eighth Amendment of the United States Constitution, of Georgia's unique statute placing on the defendant the burden of proving his intellectual disability beyond a reasonable doubt. See OCGA § 17-7-131 (c) (3). As the plurality opinion recounts, in 1988, the people of this State, acting through

their elected representatives, were the first in the nation to take the humane step of prohibiting the execution of intellectually disabled criminal defendants. See id. (j) (prohibiting the imposition of the death penalty after a finding of intellectual disability). Not long thereafter, this Court, and then the United States Supreme Court, constitutionalized that prohibition using the doctrine that applies the "cruel and unusual punishments" constitutional text based on "evolving standards of decency that mark the progress of a maturing society." See *Fleming v. Zant*, 259 Ga. 687, 689-690 (386 SE2d 339) (1989); *Atkins v. Virginia*, 536 U.S. 304, 312, 321 (122 SCt 2242, 153 LE2d 335) (2002).

That doctrine, which does not purport to be founded on the original public meaning of the constitutional text, allows judges to outlaw punishments based on their judicial conceptions of what contemporary "decency" requires. See *Atkins*, 536 U.S. at 337 (Scalia, J., dissenting) (explaining that the rule adopted by the majority opinion  "find[s] no support in the text or history of the Eighth Amendment"); *Conley v. Pate*, 305 Ga. 333, 339-341 (825

SE2d 135) (2019) (Peterson, J., concurring) (explaining that the majority opinion in *Fleming* departed without explanation from "the history and context of the Georgia Constitution, as well as over 100 years of Georgia precedent," to adopt the "evolving standards of decency" doctrine from the United States Supreme Court case law). I say "judicial conceptions," because although judges applying this doctrine often purport to be reflecting the views of contemporary American (or Georgian) society, the cases often disregard the best evidence of those views, which is contemporary *legislation* enacted by the people's elected representatives.[29]

---

[29] Perhaps the most telling example of this is the United States Supreme Court's 5-4 decision in *Kennedy v. Louisiana*, 554 U.S. 407 (128 SCt 2641, 171 LE2d 525) (2008), which prohibited under all circumstances the death penalty for rape of a child not resulting in the child's death. See id. at 421. The majority then stuck to that position even when the Court was advised in a motion for rehearing that only two years before, Congress had enacted (by vote of 374-41 in the House and 95-0 in the Senate) and the President had signed a law authorizing the death penalty for members of the military who rape a child. See *Kennedy v. Louisiana*, 554 U.S. 945, 946-948 (129 SCt 1, 171 LE2d 932) (2008) (statement of Kennedy, J., respecting the denial of rehearing); id. at 948-950 (statement of Scalia, J., respecting the denial of rehearing). Justice Scalia, who had dissented, explained why he was not voting to grant rehearing as follows:

> I am voting against the petition for rehearing because the views of the American people on the death penalty for child rape were, to tell the truth, irrelevant to the majority's decision in this case. The

Consequently, when we enter the realm of Eighth Amendment "evolving standards of decency," if there is not a holding from a United States Supreme Court case directly on point, a lower court trying to understand what validly enacted state laws that Court will decide the United States Constitution has morphed to nullify requires guessing about what the majority of Justices currently serving on that Court will decide when a particular new issue is presented to them. The *Atkins* majority explained that "[n]ot all people who claim to be mentally retarded will be so impaired as to fall within the range of mentally retarded offenders about whom

---

> majority opinion, after an unpersuasive attempt to show that a consensus against the penalty existed, in the end came down to this: "[T]he Constitution contemplates that in the end our own judgment will be brought to bear on the question of the acceptability of the death penalty under the Eighth Amendment." 554 U.S. [at 434]. Of course the Constitution contemplates no such thing; the proposed Eighth Amendment would have been laughed to scorn if it had read "no criminal penalty shall be imposed which the Supreme Court deems unacceptable." But that is what the majority opinion said, and there is no reason to believe that absence of a national consensus would provoke second thoughts.

Id. at 948-949. The dissent in *Fleming* similarly explained that in holding that the death penalty for the intellectually disabled was prohibited by the Georgia Constitution based primarily on the enactment of OCGA § 17-7-131, the majority disregarded the limitations and prospective-only application of that statute enacted by the people's representatives. See *Fleming*, 259 Ga. at 691-701 (Smith, J., dissenting).

131

there is a national consensus," and asserted that the Court would therefore "leave to the State[s] the task of developing appropriate ways to enforce the constitutional restriction upon [their] execution of sentences." *Atkins*, 536 U.S. at 317 (citation and punctuation omitted). Taking heed of those statements, this Court held in *Head v. Hill*, 277 Ga. 255, 260-263 (587 SE2d 613) (2003), and reiterated in *Stripling v. State*, 289 Ga. 370, 371-374 (711 SE2d 665) (2011), that Georgia's beyond-a-reasonable-doubt standard of proof for claims of intellectual disability (in conjunction with other procedures protecting the intellectually disabled from death sentences) does not violate the Eighth Amendment. And the en banc United States Court of Appeals for the Eleventh Circuit held that our decisions on this issue were not contrary to clearly established federal law. See *Hill v. Humphrey*, 662 F3d 1335, 1337-1338 (11th Cir. 2011) (en banc), cert. denied, 566 U.S. 1041 (132 SCt 2727, 183 LE2d 80) (2012).

Thereafter, however, in *Hall v. Florida*, 572 U.S. 701 (134 SCt 1986, 188 LE2d 1007) (2014), and *Moore v. Texas*, 581 U.S. ___ (137

SCt 1039, 197 LE2d 416) (2017), the majority on the United States Supreme Court began to constrain the leeway that the states appeared to have been given regarding how intellectual disability may be determined. The *holdings* of those two cases do not address what standard of proof may be used to evaluate an intellectual disability claim, and thus they plainly do not affect Georgia's law. But as Justice Bethel explains in his dissent, some of the *reasoning* of the cases, particularly their disapproval of state measures that "'creat[e] an unacceptable risk that persons with intellectual disability will be executed,'" *Moore*, 137 SCt at 1044 (quoting *Hall*, 572 U.S. at 704), certainly casts doubt on this State's uniquely high standard of proof.

The reasoning of the United States Supreme Court's decisions does not bind lower courts, however; only the holdings govern. Cf. *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477, 484 (109 SCt 1917, 104 LE2d 526) (1989) (explaining that even when the holding of a Supreme Court case appears to be contradicted by the reasoning of another line of decisions, the

holding rather than the subsequent reasoning is binding on lower courts). And particularly in this area of "evolving standards of decency," in which it all comes down to whether five Justices decide to "evolve" the Eighth Amendment a little more, it is risky to rely on reasoning alone. Indeed, this Court just experienced that pitfall in another area of "evolving" Eighth Amendment jurisprudence – the imposition of life without parole sentences on defendants convicted of murders committed when they were juveniles.

Since the death penalty for juveniles was outlawed by the 5-4 decision in *Roper v. Simmons*, 543 U.S. 551, 578 (125 SCt 1183, 161 LE2d 1) (2005), the clear trend line of the United States Supreme Court's cases in this area (all decided by narrow margins) was to restrict the states' authority to punish juveniles. In particular, the reasoning of the Court's 6-3 majority opinion in *Montgomery v. Louisiana*, 577 U.S. 190 (136 SCt 718, 193 LE2d 599) (2016), seemed to make it clear that before a juvenile murderer could be sentenced to life without parole, the sentencer must consider more than just the defendant's youth and its attendant characteristics; there must

be a specific determination that the defendant is one of those "rarest of juvenile offenders . . . whose crimes reflect permanent incorrigibility." Id. at 208-212. This Court and other lower courts relied on that reasoning to require such a determination. See *Veal v. State*, 298 Ga. 691, 702-703 (784 SE2d 403) (2016). See also, e.g., *Malvo v. Mathena*, 893 F3d 265, 275 (4th Cir. 2018); *Commonwealth v. Batts*, 163 A3d 410, 459 (Pa. 2017). But then the composition of the United States Supreme Court changed, and just a few weeks ago that Court held, by a 6-3 margin, that notwithstanding most of what the *Montgomery* majority opinion said, that decision does *not* require a specific finding of permanent incorrigibility. See *Jones v. Mississippi*, 593 U.S. ___ (141 SCt 1307, 1311, 209 LE2d 390) (2021). See also *Holmes v. State*, Case No. S21A0377, slip. op. at 11-17 (decided June 1, 2021). Both the three dissenters and Justice Thomas (who concurred in the judgment based on his view that *Montgomery* was wrongly decided) criticized the majority opinion for disregarding *Montgomery*'s logic and reasoning. See *Jones*, 141 SCt at 1323, 1326-1328 (Thomas, J., concurring in the judgment); id. at

135

1330-1337 (Sotomayor, J., dissenting).

*Jones* demonstrates that courts like mine should be cautious in deciding Eighth Amendment cases based on aspects of the reasoning, rather than the square holdings, of the United States Supreme Court's "evolving standards of decency" decisions, and should be wary of trying to predict which way those holdings are trending. If I had to guess today, I would say that it is likely that if the United States Supreme Court, as currently comprised, is called on to decide whether Georgia's beyond-a-reasonable-doubt-standard for proof of intellectual disability violates the Eighth Amendment, a majority of the Justices would not extend the holdings of *Hall* and *Moore* to strike down our State's statute, notwithstanding the reasoning of the majority opinions in those two cases.

Of course I (and the majority of this Court) could be wrong. Young is welcome to seek certiorari from the United States Supreme Court to have that Court tell us that we are wrong; I would obediently accept and forthrightly apply such a decision. Young and his advocates are also welcome to try to persuade the people of

Georgia, through their elected representatives, to revisit OCGA § 17-7-131 (c) (3) in light of the extensive developments in the science of intellectual disability and the law in this area since that statute was enacted more than three decades ago; if the General Assembly takes a further humane step with regard to criminal defendants who are potentially intellectually disabled, I would embrace that change. In the meantime, however, I see no compelling reason for this Court to overrule our well-established precedent on this issue.

I am authorized to state that Justice Boggs and Justice Peterson join this special concurrence.

BETHEL, Justice., dissenting

"[T]he Eighth and Fourteenth Amendments to the [United States] Constitution forbid the execution of persons with intellectual disability." *Hall v. Florida*, 572 U. S. 701, 704 (I) (134 SCt 1986, 188 LE2d 1007) (2014) (citing *Atkins v. Virginia*, 536 U. S. 304, 321 (IV) (122 SCt 2242, 153 LE2d 335) (2002)). However, before a person can access this constitutional protection, Georgia requires that the person first prove that he or she is intellectually disabled beyond a reasonable doubt. See OCGA § 17-7-131 (c) (3), (j). As others have before him, Young argues that Georgia's law is unconstitutional. See, e.g., *Stripling v. State*, 289 Ga. 370, 371-374 (1) (711 SE2d 665) (2011); *Head v. Hill*, 277 Ga. 255, 260 (II) (B) (587 SE2d 613) (2003) (rejecting habeas court decision that beyond-a-reasonable-doubt standard is unconstitutional under *Atkins* because "nothing in *Atkins* instructs the states to apply any particular standard of proof to [intellectual disability] claims"). But Young suggests that subsequent decisions of the Supreme Court of the United States cast

138

doubt on *Stripling* and *Head* and compel a different conclusion. I agree.

In *Atkins*, the Supreme Court of the United States determined that the United States Constitution prohibits the execution of intellectually disabled persons. See 536 U. S. at 321 (IV). When this constitutional protection was identified, its contours were not particularly well-defined, and it appeared that the individual states were to be responsible for defining and safeguarding this right. See id. at 317 (III) ("[W]e leave to the States the task of developing appropriate ways to enforce the constitutional restriction upon their execution of sentences." (citation and punctuation omitted)); see also *Bobby v. Bies*, 556 U. S. 825, 831 (I) (129 SCt 2145, 173 LE2d 1173) (2009) ("Our opinion [in *Atkins*] did not provide definitive procedural or substantive guides for determining when a person who claims [intellectual disability] will be so impaired as to fall within *Atkins'* compass. We left to the States the task of developing appropriate ways to enforce the constitutional restriction." (citation and punctuation omitted)). Since then, however, we have learned that

States are not authorized to enforce legislative rules or judicial tests that by design or operation create "an unacceptable risk that persons with intellectual disability will be executed." *Hall*, 572 U. S. at 704 (I); see also *Moore v. Texas*, __ U. S. __ (137 SCt 1039, 1051 (IV) (C) (1), 197 LE2d 416) (2017).

In *Hall*, Florida's rule precluding a finding of intellectual disability for any person scoring over 70 on an IQ test failed constitutional review because it created "an unacceptable risk that persons with intellectual disability will be executed." *Hall*, 572 U. S. at 704 (I). The "rigid" statutory rule in *Hall* was deemed unacceptable by the Supreme Court, in part because the strict rule failed to consider the margin of error and variability inherent in IQ testing, and thus disregarded established medical practice. See id. at 713-714 (III) (A).

Likewise, in *Moore*, the seven-factor test established by Texas courts to evaluate intellectual disability was found to be deficient because "by design and in operation," the Texas test created "'an unacceptable risk that persons with intellectual disability will be

executed.'" *Moore*, 137 SCt at 1051 (IV) (C) (1) (citing *Hall*, 572 U. S. at 701). More specifically, the Supreme Court determined that the Texas test failed to protect those with mild levels of intellectual disability from execution. See id. This was impermissible because "the entire category of intellectually disabled offenders" is constitutionally protected from execution. (Citation, punctuation, and emphasis omitted.) Id.

The question before us, then, is whether Georgia's requirement that a defendant prove his or her own intellectual disability beyond a reasonable doubt creates "an unacceptable risk that an intellectually disabled person will be executed." *Hall*, 572 U. S. at 704 (I). Here, the existence of such a risk seems plain.

Obviously, some portion of persons who are actually intellectually disabled would, nevertheless, find it difficult to prove that fact in a judicial proceeding under any standard of proof. See *Raulerson v. Warden*, 928 F3d 987, 1015, 1016 (I) (C) (11th Cir. 2019) ("Intellectual disability is an inherently imprecise and partially subjective diagnosis. . . . Given that intellectual disability

disputes will always involve conflicting expert testimony, there will always be a basis for rejecting an intellectual disability claim.") (Jordan, J., concurring in part and dissenting in part); see also *Hill v. Humphrey*, 662 F3d 1335, 1367 (I) (11th Cir. 2011) (Barkett, J., dissenting) ("[M]ental retardation spans a spectrum of intellectual impairment[.]"). There is a risk of failure in every effort to divine truth through a judicial proceeding. Employing the highest burden of proof in our system of justice, however, significantly increases the risk of an offender with an actual intellectual disability being executed because he or she is unable to meet the high standard of proof.[30] Under Georgia's standard, a meaningful portion of intellectually disabled offenders are effectively excluded from the constitutional protection recognized in *Atkins*. See *Humphrey*, 662 F3d at 1365-1366 (Barkett, J., dissenting) (noting that the State

---

[30] Indeed, the beyond-a-reasonable-doubt standard employed in criminal proceedings has been described in the legal community as a societal preference for acquitting guilty people rather than risking incarceration of the innocent. See, e.g., *In re Winship*, 397 U. S. 358, 372 (90 SCt 1068, 25 LE2d 368) (1970) (Harlan, J., concurring) ("I view the requirement of proof beyond a reasonable doubt in a criminal case as bottomed on a fundamental value determination of our society that it is far worse to convict an innocent man than to let a guilty man go free.").

does not "have unfettered discretion to establish procedures that through their natural operation will deprive the vast majority of [intellectually disabled] offenders of their Eighth Amendment right not to be executed"). The United States Constitution protects *all* intellectually disabled offenders from execution under *Atkins*, and Georgia's standard "effectively limits the constitutional right protected in *Atkins* to only those who [suffer from severe or profound intellectual disability]" such that their disability is not subject to any real dispute or doubt. Id. at 1365-1377. But as the Supreme Court has determined, the Eighth and Fourteenth Amendments must afford protection to an offender whose disability is less obvious or profound. See *Moore*, 137 SCt at 1051 (IV) (C) (1).

Further, when the standard of proof is beyond a reasonable doubt, an individual juror who merely believes the defendant to be probably or even clearly intellectually disabled would still be authorized to join a sentence of death if any part of their mind was wavering, unsettled, or unsatisfied that the defendant had proven intellectual disability. We know that a rigid cutoff for IQ that does

not account for variability and margin of error in the test is unreasonable. See *Hall*, 572 U. S. at 713-714 (III) (A). Likewise, we know that employing a test that exposes those with mild intellectual disabilities to a greater risk of execution is unreasonable. See *Moore*, 137 SCt at 1051 (IV) (C) (1). With these truths in mind, then, it seems plain to me that requiring the highest burden of proof known to our judicial system is also unreasonable because it fails to protect intellectually disabled persons who are unable to prove that fact beyond a reasonable doubt. Accordingly, while I concur in the balance of the Chief Justice's opinion, I respectfully dissent with respect to Division 25. Thus, I would vacate the trial court's judgment and remand the case for a new jury trial on the sole question of intellectual disability and for resentencing consistent with the result of that trial, or for other constitutionally agreeable proceedings.